UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
:
UNITED STATES OF AMERICA,                          :        21-CR-495 (ARR)
:
    -versus-                                      :        NOT FOR ELECTRONIC
:        OR PRINT PUBLICATION
GERMAINE RAMSEY,                                   :
:
            *Defendant*.                          :        **OPINION & ORDER**
:
------------------------------------------------------------------- :
X

ROSS, United States District Judge:

Defendant, Germaine Ramsey, a United States Postal Service ("USPS") employee, is charged with conspiracy to convert property of the United States, in violation of 18 U.S.C. §§ 371, 3551 *et seq.* and conversion of property of the United States, in violation of 18 U.S.C. §§ 641, 2, 3551 *et seq.* She moves to suppress statements made to agents from the USPS Office of the Inspector General ("USPS OIG") during two separate encounters, one on January 2, 2020, and the other on January 28, 2020. For the following reasons, I deny Ms. Ramsey's motion.

## BACKGROUND

*The Relevant Offense*

In late December 2019, a remittance envelope and registry book, where the daily remittance value is recorded, went missing from a safe at the Metropolitan Station Post Office ("Metro Station") in Brooklyn, New York. Feb. 3, 2022 Tr. 5:20−6:17 ("Tr."). The remittance had been deposited in the safe on December 21 and was valued at approximately $7,781.00. *See* Mem. in Supp. Def.'s Mot. to Suppress 2 ("Suppression Motion"), ECF No. 21; Gov'ts' Opp'n to Def.'s Mot. to Suppress 2 ("Opp'n"), ECF No. 22; Tr. 9:4−13.

Video surveillance from December 22 shows Ms. Ramsey entering and closing the door to

the financial office, where the vault containing the safe is located; entering the vault; partially closing the vault's door; standing in the vicinity of the safe; and then exiting the financial office. Ms. Ramsey's total time spent in the vault is about forty seconds.[1] A short time later, an individual who does not work for USPS is seen entering the vault and closing the door. Tr. 13:4–12, 64:5–22. This individual, identified by the government as "CC-1", *see* Opp'n 2, remains in the vault for approximately ten minutes before exiting the Metro Station USPS building. Tr. 13:18–14:8. Approximately fifteen minutes later, CC-1 is captured returning to the vault for a brief period. Opp'n 2; *see also* Tr. 14:9–13.

Between December 22 and December 23, when it was learned that the remittance was missing, other USPS employees entered the vault. Tr. 11:5−13:3, 17:2–19. According to Special Agent Jennifer McInerney ("Special Agent McInerney" or "Agent McInerney"), who reviewed the full thirty-six hours of surveillance footage between when the remittance was deposited in the safe on December 21 and when it was discovered to be missing, none of these employees closed the door to the vault. *Id.* at 11:5–14:13; 17:2–22. Additionally, apart from the employee who discovered that the remittance was missing, none of these employees were seen on video opening the safe. *Id.* at 17:23−25.

Based on this footage, the USPS OIG agents assigned to this matter—Special Agent McInerney and Special Agent Jocelynne Pastrana ("Special Agent Pastrana" or "Agent Pastrana")—believed that Ms. Ramsey had provided information to CC-1 that enabled him to access the safe and steal the remittance. *Id.* at 18:10−17. A search of Ms. Ramsey's Facebook page revealed that someone who, according to Agent McInerney, looked like CC-1 was a friend of Ms.

---

[1] This description is based on my personal viewing of the video surveillance, as well as Special Agent Jennifer McInerney's description of the footage during the February 3, 2022 evidentiary hearing.

Ramsey's on the social media site. *Id.* at 18:22–19:24. The agents concluded that this individual, "RG," was CC-1. *Id.* at 19:14–21. When the agents ran a criminal history report on RG, they learned that he had a series of felony convictions, as well as burglary-related charges. *Id.* at 19:25−20:5.

*January 2, 2020 Questioning*

On January 2, 2020, Special Agents McInerney and Pastrana questioned five USPS employees about the missing remittance. As was done with the other four employees, Ms. Ramsey, who was questioned last, was advised of her rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967). *See* Notice of Mot. to Suppress, Ex. B, ECF No. 21-1; Tr. 77:8–78:15. Most of the agents' questioning of Ms. Ramsey took place in the Metro Station's finance office; however, at some point, Ms. Ramsey and the agents relocated to a nearby stock room for more privacy. Tr. 30:9−31:7 ("[A]t the end of the day we were receiving a lot of interruptions [in the finance office] . . . so we decided that we would move to [the stock room] . . . [to] limit the interruptions.").

The agents' questions ranged from inquiring about RG, who Ms. Ramsey stated was her fiancé, to asking Ms. Ramsey about her personal finances, *id.* 69:16−21; 82:9−11. At least once, the agents showed Ms. Ramsey the video of her entering the vault, and the agents repeatedly asked Ms. Ramsey about her reasons for entering. Tr. 78:19−79:4. Ms. Ramsey eventually admitted that she had no reason to be in the vault but denied taking the remittance or assisting someone in the same. *Id.* at 32:5−21. Ms. Ramsey was twice asked by the agents if she would be willing to submit to a polygraph examination and eventually said yes. *Id.* at 34:22−35:4.

The special agents' questioning of Ms. Ramsey lasted between two and three hours. Suppression Motion 5; Tr. 29:5−30:5. The encounter was terminated when Ms. Ramsey told Agents McInerney and Pastrana that she was done answering questions. Tr. 159:20−24.

*January 28, 2020 Questioning*

On January 28, 2020, Special Agents McInerney and Pastrana met Ms. Ramsey outside the Parkville Station Post Office ("Parkville Station") shortly after Ms. Ramsey was taken off the clock.[2] *See id.* at 88:20−89:25; Suppression Motion 6 ("The supervisor told Ms. Ramsey to retrieve her belongings and leave the post office immediately."). Although Ms. Ramsey and the agents disagree on the substance of their discussion at the Parkville Station, *see infra*, Discussion II.A, Ms. Ramsey ultimately agreed to be driven by the agents to 1050 Forbell Street ("Forbell"), where the USPS OIG office is located, for additional questioning. *See* Tr. 39:2–9; 39:24−35:2, 88:24−88:3. Once at Forbell, Ms. Ramsey was escorted by the agents to an OIG conference room, where Special Agent and Polygraph Examiner Russell Strasser was waiting. *Id.* at 40:18–41:14.

Approximately forty-two minutes after arriving at Forbell, Ms. Ramsey was advised of her rights under *Arizona v. Miranda*, 384 U.S. 436 (1966). Tr. 112:7–19; 113:23–114:3. Around that same time, Ms. Ramsey also signed a polygraph consent form. *See* Tr. 121:20−24. Special Agent McInerney was in the room with Special Agent Strasser when Ms. Ramsey was advised of her rights, after which Agent McInerney went to a separate room. Tr. 93:24−94:3; 127:21−128:3. Agents Pastrana and McInerney proceeded to listen through a monitor to Agent Strasser's questioning of Ms. Ramsey; however, according to Agent McInerney, there were answers provided by Ms. Ramsey that she was unable to hear. *Id.* at 94:16−24.

Over the course of several hours, Ms. Ramsey was asked by Special Agent Strasser about the events of December 22, 2019. According to a January 29 memorandum prepared by Agent Strasser, Ms. Ramsey admitted that she had provided RG with information about where the

---

[2] The Parkville Post Office was Ms. Ramsey's assigned USPS Office, although Ms. Ramsey was temporarily assigned to the Metro Office in December 2019. Tr. 89:11−19.

4

remittance was located but alleged that she had not known RG was going to take the money. Notice of Mot. to Suppress, Ex. H 3−4, ECF No. 22-1. Although a polygraph machine was in the conference room the entire time, it was never administered. Suppression Motion 16; Tr. 125:17–19; 142:20–21; *see also* 93:18–21.

In total, Ms. Ramsey was at Forbell for seven-and-a-half hours. *See* Notice of Mot. to Suppress, Ex. E, ECF No. 21-1. According to Agent Strasser, this period included forty-two minutes during which Ms. Ramsey deliberated whether to undergo questioning, as well as an hour-and-a-half lunchbreak. *Id.* at 113:23–114:3; 124:10−125:5; 134:18–136:6.

*Procedural History*

On January 14, 2022, Ms. Ramsey moved to suppress her statements made to Special Agents McInerney and Pastrana on January 2 and to Special Agent Strasser on January 28. She alleges violations of her Fourth and Fifth Amendment rights across these two dates. The government opposes.

On February 3, 2022, I held an evidentiary hearing on Ms. Ramsey's motion. The government proffered three witnesses—Agents McInerney, Pastrana, and Strasser—who each testified to the events of January 2 and 28. Ms. Ramsey chose not to testify, and her counsel did not put forward any other witnesses. I found all three agents to be credible witnesses during their direct and cross-examinations and thus accept their testimony as true for purposes of deciding the instant motion. While I consider sworn statements made by Ms. Ramsey as part of her Motion to Suppress, *see* Notice of Mot. to Suppress, Ex. A ("Ramsey Decl."), ECF No. 21-1, because I was unable to form an opinion as to Ms. Ramsey's credibility and truthfulness, I treat them only as allegations at this time. *See United States v. Robles*, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (explaining that "courts give greater weight to witness testimony, which is subject to cross

5

examination, than to sworn affidavits" (citation, quotations, and modifications omitted)); *United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) ("Since [the defendant] did not testify at the hearing, and was not subject to cross-examination, the Court was unable to form an opinion as to his credibility or the truthfulness of his allegations."); *Williams v. United States*, No. 11-CR-198(4) (NAM), 2019 WL 4111130, at *5 (N.D.N.Y. June 12, 2019) (same).

## DISCUSSION

### I. January 2, 2020

Ms. Ramsey seeks to suppress her statements made on January 2, 2020, alleging that they were made in violation of her Fifth Amendment rights. Ms. Ramsey principally contends that her questioning by Special Agents McInerney and Pastrana was a custodial interrogation for which Ms. Ramsey was not advised of her rights under *Miranda*. In the alternative, Ms. Ramsey argues that her statements were involuntary.

#### A. Special Agents McInerney and Pastrana were not required to advise Ms. Ramsey of her *Miranda* rights.

Pursuant to the Fifth Amendment, "statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her [legal] rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016) (citing *Miranda*, 384 U.S. at 444). It is undisputed that Ms. Ramsey was not advised of her *Miranda* rights on January 2. *See* Suppression Motion 4–5, 9−10; Opp'n 3, 8−9. Whether she was required to be, however, depends on whether she was interrogated and in custody on that day. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

As an initial matter, I find that the agents' questioning of Ms. Ramsey on January 2 was an interrogation. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

6

response from the suspect." *Id.* At the February 3 hearing, Special Agent McInerney testified that at the point that she and Special Agent Pastrana spoke with Ms. Ramsey on January 2, Ms. Ramsey was their "main suspect." Tr. 80:12−14. Indeed, this was why the agents spoke with Ms. Ramsey after first interviewing four other USPS employees: It is common to speak with the lead suspect last in order to establish other facts pertinent to the investigation. *Id.* at 71:16–23. According to Agent McInerney, the questions asked of Ms. Ramsey were intended to advance the agents' criminal investigation and establish probable cause that Ms. Ramsey had assisted in the stealing of the remittance and registry book. *Id.* at 79:24−81:3. In light of this, it is clear that Agents McInerney and Pastrana knew their questions were "reasonably likely to elicit an incriminating response from [Ms. Ramsey.]" *Innis*, 446 U.S. at 301; *see also Faux*, 828 F.3d at 134–35 ("It is uncontested that [the defendant] was never [advised of his *Miranda* rights], and it is undisputed that the questioning constituted an 'interrogation' because the agents expressly questioned [the defendant] about potentially incriminating activities." (citing *Innis*, 446 U.S. at 300−02)).

This conclusion notwithstanding, I find that Agents McInerney and Pastrana were not required to advise Ms. Ramsey of her rights under *Miranda* because Ms. Ramsey was not in custody during the January 2 interrogation. "[C]ustody for *Miranda* purposes is not coterminous with . . . the colloquial understanding of custody." *United States v. FNU LNU*, 653 F.3d 144, 152–53 (2d Cir. 2011) (quotations omitted). Instead, "[t]he test for determining custody . . . asks (1) whether a reasonable person would have thought [s]he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood [her] freedom of action to have been curtailed to a degree associated with formal arrest." *Faux*, 828 F.3d at 135 (internal quotations and citations omitted); *see also United States v. Belitz*, No. 21-CR-693 (JSR), 2022 WL 205585, at *2 (S.D.N.Y. Jan. 24, 2022) ( "The 'free to leave' inquiry is a necessary, but not

7

determinative first step, and the second question remains the ultimate inquiry: 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" (quoting *United States v. Newton*, 369 F.3d 659, 670−71 (2d Cir. 2004))). The inquiry is an objective one: "An individual's subjective belief about his or her status generally does not bear on the custody analysis." *Faux*, 828 F.3d at 135. Instead, factors to be considered include "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (internal citations omitted).

Evaluating the totality of circumstances, I conclude that a reasonable person in Ms. Ramsey's situation would have believed she was free to leave the encounter with Agents McInerney and Pastrana. Ms. Ramsey was questioned at her place of work, *see United States v. Schaffer*, No. 12-CR-430 (ARR), 2014 WL 1515799, at *8 (collecting cases where places of work have been found to be non-custodial), by agents who were in plainclothes. Tr. 36:25−37:1; *see also* 22:13–23:23. Neither the agents' weapons nor their handcuffs were visible at any point. *Id.* at 37:2−5. The door to the finance office, where Ms. Ramsey was questioned, was not locked. While the door was closed, Agents McInerney credibly testified that it was for privacy purposes and that this purpose was explained to Ms. Ramsey. *See id.* at 24:12–13; 82:21−23. Indeed, other USPS employees went into and out of the finance office during the interrogation, eventually leading Ms. Ramsey and the agents to relocate to the stock room for additional privacy. *Id.* at 30:9–31:5; 83:12−22. At one point during the interrogation, Ms. Ramsey requested a break, which she was given. *Id.* at 29:8−13. Neither agent followed or watched Ms. Ramsey while she was gone, and Ms. Ramsey returned to the finance office about fifteen minutes later. *Id.* at 29:14−30:5. Agent

McInerney testified that if Ms. Ramsey had walked out of the post office during this break, the interview would have ended. *Id.* While no one factor is dispositive, these circumstances, taken together, make clear that a reasonable person in Ms. Ramsey's shoes would have understood that she could terminate the encounter with Agents McInerney and Pastrana. Indeed, the interview ultimately ended because Ms. Ramsey told the agents that she was done answering their questions. *Id.* at 159:20−24.

The strongest counterpoint to my conclusion is Ms. Ramsey's allegation that on January 2, she asked for but was denied a union representative. Ramsey Decl. ¶ 6. However, at the February 3 hearing, Agent McInerney repeatedly testified that Ms. Ramsey did not ask for a union representative and that had she asked for one, the agents would have paused the interview to accommodate her request. Tr. 27:24−28:13; 74:18−24; 75:22−76:5. While Ms. Ramsey's allegations, if true, could tip the scales in her favor, her allegations do not trump Agent McInerney's testimony on this point. *See supra*, Background.

Because I find that a reasonable person would have believed they were free to leave the January 2 interrogation, I need not address whether a reasonable person would have "understood [her] freedom of action to [be] curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). As Ms. Ramsey's interrogation on this day was non-custodial, Agents McInerney and Pastrana were not required to advise Ms. Ramsey of her rights under *Miranda*.

### B. Ms. Ramsey's January 2 statements were not involuntary.

Ms. Ramsey argues that even if she was not in custody during the January 2, 2020 interrogation, her Fifth Amendment rights were still violated because her statements were not voluntary. I find this argument unavailing in light of the testimonial evidence before me.

9

"The [Fifth] Amendment not only protects [an] individual against being involuntarily called as a witness against [her]self in a criminal prosecution but also privileges [her] not to answer official questions put to her in any other proceeding . . . where the answers might incriminate [her] in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). Accordingly, even statements made in non-custodial settings must be suppressed if it is determined that "the statements were not made voluntarily—that is, . . . [the suspect's] will was overborne." *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) (internal quotations and citation omitted). "A determination as to the voluntariness of a [statement] requires an inquiry into all the circumstances surrounding the law enforcement officials' conduct to ascertain whether it overcame the accused's will to resist and brought about a [statement] that was not freely self-determined." *Campaneria v. Reid*, 891 F.2d 1014, 1019–20 (2d Cir. 1989). The suspect's characteristics, the conditions of interrogation, and the conduct of the agents are factors to be considered. *Kourani*, 6 F.4th at 352.

In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that an individual who must choose between forfeiting her job or incriminating herself does not speak voluntarily. According to the government, subsequent to *Garrity*, certain civil service agencies, including the USPS, developed a *Garrity* warning to advise employee-suspects of their right to remain silent under certain circumstances. Opp'n 10−11. The USPS *Garrity* form, which was signed by Ms. Ramsey on January 2, stated, *inter alia*, that Ms. Ramsey had "the right to remain silent if [her] answers may tend to incriminate [her]"; that if she "refuse[d] to answer questions because [her] answers may tend to incriminate [her], [she would] not be disciplined solely for remaining silent"; and that the "interview [was] strictly voluntary, and [Ms. Ramsey] may leave or stop answering questions at any time." Notice of Mot. to Suppress, Ex. B.

Although Ms. Ramsey signed the USPS's *Garrity* form on January 2, *see id.*, Ms. Ramsey

10

argues that she was deprived of her "free choice to admit, to deny, or to refuse to answer," *Garrity*, 385 U.S. at 496 (citation omitted), the agents' questions because of the combined effect of the *Garrity* advisal and comments made by the agents. Suppression Motion 10–12. According to Ms. Ramsey, prior to signing the *Garrity* form, she was told by Special Agents McInerney and Pastrana that "everyone had to sign the [*Garrity*] form . . . and that it did not mean [Ms. Ramsey was] guilty." Ramsey Decl. ¶ 5. Between the text of the *Garrity* advisal itself and this commentary, Ms. Ramsey believed that if she invoked her right to remain silent, she would be putting her job at risk and conveying that she was guilty. Suppression Motion 11−12. Thus, Ms. Ramsey alleges that she was compelled to speak.

This argument is difficult to parse. It seems that Ms. Ramsey is claiming that she was under the impression, based at least in part on the *Garrity* form, that she would not be disciplined by USPS for remaining silent only if her answers were incriminating. *Id.* at 11. However, this is the converse of the actual advisal she signed, which explained that if Ms. Ramsey stayed silent because her answers may tend to incriminate her, then she would not be disciplined *only* for remaining silent. In other words, silence could not be the exclusive grounds for any disciplinary action by USPS. There is nothing in the record to suggest that Ms. Ramsey did not understand the *Garrity* form when she signed it.

Nor can I credit Ms. Ramsey's argument that she felt she had no choice but to speak to Special Agents McInerney and Pastrana because of comments made by the agents. At the February 3 hearing, Agent McInerney denied making any statements to Ms. Ramsey about having to sign the *Garrity* form or statements concerning the relationship between the *Garrity* form and Ms. Ramsey's guilt. *See* Tr. 27:4−17. Because I found Agent McInerney a credible witness, I am compelled to credit her testimony over Ms. Ramsey's allegations.

Based on Agent McInerney's testimony, the facts before me are distinguishable from those in *United States v. Kaur*, 8-CR-428 (KAM), 2008 WL 5156582 (E.D.N.Y. Dec. 8, 2008), which Ms. Ramsey discusses in support of her argument, Suppression Motion 12. In *Kaur*, the court found that the defendant's statements were not freely given to a USPS OIG special agent because the agent credibly testified that on two occasions, he had told the defendant that "if [she] didn't do anything criminal, [she] would know [the *Garrity* warning] doesn't apply." 2008 WL 5156582, at *5. This commentary, the court held, undercut the defendant's understanding of her rights under *Garrity*, and the defendant's statements were therefore subject to suppression. By contrast, I find that Agents McInerney and Pastrana did not make any comments to Ms. Ramsey that would have compromised Ms. Ramsey's understanding of her rights under *Garrity*.

## II. January 28, 2020

I turn next to Ms. Ramsey's contention that the January 28, 2020 interrogation[3] violated her Fourth and Fifth Amendment rights. As to her Fourth Amendment claim, Ms. Ramsey alleges that on January 28, she was seized by Special Agents McInerney and Pastrana without probable cause. As to her Fifth Amendment claim, Ms. Ramsey argues that her *Miranda* waiver at Forbell was not knowing, voluntary, and intelligent. Based on the evidence before me, I find neither of these arguments availing.

### A. Special Agents McInerney and Pastrana had probable cause to seize Ms. Ramsey.

Ms. Ramsey alleges that when Special Agents McInerney and Pastrana met her outside of the Parkville Station, they "told [Ms. Ramsey] to get into their car" because she "needed to go to

---

[3] Like the January 2 interrogation by Special Agents McInerney and Pastrana, Special Agent Strasser's January 28 questioning of Ms. Ramsey was intended to "elicit an incriminating response from [Ms. Ramsey.]" *Innis*, 446 U.S. at 301. Accordingly, I consider the encounter an interrogation as well.

12

Forbell to answer more questions and do a lie detector test." Ramsey Decl. ¶¶ 11–14. According to Ms. Ramsey, when she asked the agents "if [she] could drive [herself] and meet them at Forbell[,] [the agents] said no." *Id.* ¶ 15. The government contests this version of events. At the hearing, Agent McInerney testified that she did not recall Ms. Ramsey asking to drive herself to Forbell. *See* Tr. 40:21–25; *see also* 89:22–25:6. Agent McInerney also testified that she and Agent Pastrana asked Ms. Ramsey to go with them to Forbell because they had follow-up questions, not because they intended for Ms. Ramsey to take a polygraph exam. *Id.* at 39:12–25. While the exchange between the agents and Ms. Ramsey bears on whether Ms. Ramsey was seized on January 28, I ultimately need not decide this question: Even assuming that Ms. Ramsey was seized, Special Agents McInerney and Pastrana had probable cause both to seize and to arrest her.

"Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368–69 (2d Cir. 2007) (collecting cases). This inquiry is an objective one: "[A]n arresting officer's state of mind (except for the facts that [s]he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also Whren v. United States*, 517 U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.").

At the point that the agents confronted Ms. Ramsey, they knew sufficient facts to reasonably believe that Ms. Ramsey was involved in the missing remittance. On February 3, Agent McInerney testified that she watched the entire thirty-six hours of video surveillance between when the remittance was deposited in the safe of the finance office on December 21 and when it was

13

discovered to be missing on December 23. Tr. 57:24−58:10. Ms. Ramsey was the only USPS employee to enter the vault between when the remittance was deposited and when an individual unassociated with USPS was seen entering the vault, closing the door, and emerging a substantial period of time later. *Id.* at 12:19−14:13; 64:5–22. Ms. Ramsey was also the only USPS employee to enter and close the door to the vault during the thirty-six-hour span. *Id.* at 32:18−19. Finally, on January 2, Ms. Ramsey told the agents that she had not had any reason to be in the vault on December 22. *Id.* at 32:20−21. On these facts alone, I find that as of January 28, Agents McInerney and Pastrana had probable cause to believe Ms. Ramsey was involved in the disappearance of the remittance.[4]

Because the agents had probable cause to believe that Ms. Ramsey was involved in the commission of an offense, the events of January 28 did not violate Ms. Ramsey's Fourth Amendment rights.

### B. There is no evidence in the record to suggest that Ms. Ramsey's *Miranda* waiver was not knowing, voluntary, or intelligent.

Ms. Ramsey's final argument in support of her Motion to Suppress is that her *Miranda* waiver was not knowing, voluntary, and intelligent. Suppression Motion 13–16. A waiver is

---

[4] At the February 3 hearing, Agent McInerney testified that based on the features of the third party seen entering the vault—specifically his facial hair and the color of his skin—she and Agent Pastrana determined that he resembled Ms. Ramsey's Facebook friend RG. Tr. 18:22–19:24; 65:9–66:21. When asked about RG on January 2, Ms. Ramsey stated that he was her fiancé. *Id.* at 69:16−21. The agents separately searched RG's arrest and conviction history, which revealed a stealing-related charges. *Id.* at 19:25–20:5. The government contends that together this information provided Agents McInerney and Pastrana with additional probable cause to believe Ms. Ramsey was involved in the disappearance of the remittance. While the relationship of Ms. Ramsey to RG and RG's arrest and conviction history may well have given the agents additional probable cause, based on my review of the video surveillance, it is unclear how Agents McInerney and Pastrana were able to determine that the individual seen in the surveillance was RG. The individual who entered the vault was wearing a big winter jacket and his face was largely hidden by a hood. Nevertheless, Ms. Ramsey's conduct alone, as based on the video surveillance and her admission on January 2, gave rise to probable cause.

"knowing" where it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). It is voluntary where "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran*, 475 U.S. at 421). The government bears the burden of demonstrating that any waiver was knowing and voluntary, and in determining the sufficiency of a waiver, I am to view the totality of the circumstances. *United States v. Gonzalez*, 764 F.3d 159, 166 (2d Cir. 2014) (collecting cases). These include "the background, experience, and conduct of the accused." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). In addition, I consider the conditions of interrogation and the conduct of the agents on January 28. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). Based on the full evidence before me, I find that the government has met its burden.

As an initial matter, the parties do not dispute that Ms. Ramsey signed a *Miranda* advisal form on January 28, 2020. *See* Suppression Motion 6–7, 14−15; Opp'n 5, 17. This form clearly articulated each of the rights that Ms. Ramsey was abandoning by engaging with Agent Strasser: the right to remain silent, the right to counsel, and the right to stop answering questions. Notice of Mot. to Suppress, Ex. F, ECF No. 21-1. Because Ms. Ramsey has not alleged that she had difficulty reading or understanding the advisal form, her express waiver, although not conclusive, is strong evidence that it was knowingly and freely given. *See Plugh*, 648 F.3d at 127−28; *see also United States v. Shehadeh*, 940 F. Supp. 2d 66, 71 (E.D.N.Y. 2012) ("Though a signed Miranda waiver is 'usually strong proof' that a suspect has voluntarily waived his rights, it is by no means conclusive on the issue." (quoting *Butler*, 441 U.S. at 373)).

Ms. Ramsey contends that her waiver was not voluntary because it was the result of

15

coercive tactics by Agent Strasser. Suppression Motion 14–15. Specifically, Ms. Ramsey alleges that she was not *Mirandized* until forty-two minutes after she arrived at Forbell[5] and that the polygraph machine, which was present in the Forbell conference room throughout the interrogation, was intended to coerce her. *Id.* at 15−16. I find neither of these arguments persuasive.

      The record clearly indicates that during the forty-two minutes between when Special Agent Strasser's questioning of Ms. Ramsey began and when she signed the *Miranda* form, Ms. Ramsey was deliberating whether to proceed with the interrogation, not providing inculpatory statements. Agent Strasser testified that upon Ms. Ramsey's arrival at Forbell, he explained who he was, why he was there, and that Ms. Ramsey's decision to speak with him was completely voluntary. Tr. 112:20−24. Agent Strasser reiterated this last part at least five times. *Id.* at 112:25−113:2. Ms. Ramsey then asked if she could make a phone call, which Agent Strasser advised her to make in the hallway "because it would be outside the OIG facility and [the agents] wouldn't be able to listen in." *Id.* at 113:10−13. Ms. Ramsey proceeded to make the call in the hallway, by herself. *Id.* at 114:4−116:3; *see also id.* at 116:4–117:23. After Ms. Ramsey returned to the conference room, and once she agreed to speak with Agent Strasser, she was advised of her rights under *Miranda*. *Id.* at 113:20−114:6; 117:24–118:5; 134:18−136:6. Ms. Ramsey has not alleged that she was questioned by Agent Strasser during this forty-two-minute period—indeed, Ms. Ramsey's affidavit does not allege any material fact about the conditions of her January 28 interrogation by Agent Strasser, *see* Ramsey Decl.—and Agent Strasser testified that the only question he asked

---

[5] In her motion, Ms. Ramsey alleges that forty-three minutes passed between when her interrogation began and when she was advised of her rights under *Miranda*. Suppression Motion 14. Because these times were 10:10am and 10:52 am, *see* Notice of Mot. to Suppress, Ex. E, the correct time is forty-two minutes.

16

Ms. Ramsey during this time was if she would consider taking a polygraph exam, Tr. 112:3−19. In light of this evidence, I do not find that Agent Strasser intentionally delayed advising Ms. Ramsey of her legal rights. *Cf. United States v. Capers*, 627 F.3d 470, 481 (2d Cir. 2010) ("The only legitimate reason to delay intentionally a *Miranda* warning until after a custodial interrogation has begun is to protect the safety of the arresting officers or the public—neither of which was an issue here."). Accordingly, the forty-two-minute delay did not vitiate the voluntariness of Ms. Ramsey's waiver.

Ms. Ramsey next contends that the presence of the polygraph machine in the conference room was purely coercive. Suppression Motion 15−16. Ms. Ramsey seems to be implying that because Agent Strasser did not administer the data collection component of the polygraph examination over the course of seven-and-a-half hours, he never intended to; rather, the polygraph machine was a coercive tactic used to make Ms. Ramsey believe that she would be tested. Ms. Ramsey's argument here goes against the weight of the evidence. Ms. Ramsey was first asked to submit to a polygraph examination on January 2. Tr. 34:22−35:4. On January 3, Agent McInerney wrote to Agent Strasser requesting that he conduct a polygraph examination of Ms. Ramsey. *Id.* at 87:6−88:19. The original polygraph examination was supposed to take place on January 14, 2020, but when Agents McInerney and Pastrana showed up at the Metro Station, they were informed that Ms. Ramsey was not there. *Id.* at 38:14−23. The polygraph examination was therefore rescheduled for January 28. *Id.* at 38:25–39:1. After deciding that she would speak with Agent Strasser on January 28, Ms. Ramsey was asked to fill out a polygraph consent form, which she did; the consent form explained that no adverse action would be taken against Ms. Ramsey for her refusal to consent to the exam. *Id.* at 121:20−122:15. Finally, at the February 3 hearing, Agent Strasser testified that he did not ultimately use the polygraph machine on January 28 both because it was

obvious to him that Ms. Ramsey was being untruthful and because Ms. Ramsey ended the interview before he had a chance to. *Id.* at 146:7−147:3. This cumulative evidence paints a compelling picture that Agent Strasser intended to administer the full polygraph examination on January 28 but did not do so when it appeared futile. Accordingly, I am unpersuaded that the presence of the polygraph machine in the conference room was a coercive tactic and find that its presence did not compromise the voluntariness of Ms. Ramsey's *Miranda* waiver.[6]

Looking to the circumstances of January 28, I find that Ms. Ramsey's waiver was knowing and voluntary. Her waiver was express and made after a forty-two-minute deliberation. In addition, there is ample evidence in the record that neither the conditions of interrogation nor Agent Strasser's conduct were coercive. Ms. Ramsey was told five times that proceeding with questioning was voluntary, and she was clearly advised of her rights. *Id.* at 112:20−113:2; 117:24−118:5; 119:11–121:15. Midway through the interview, Ms. Ramsey requested a break, during which she went to the cafeteria for lunch. *Id.* at 124:13–125:5. Her break lasted over an hour, and Agent Strasser was not with Ms. Ramsey during this time. *See id.* It was also Ms. Ramsey

---

[6] At the February 3 hearing, defense counsel relatedly argued that Agent Strasser called the January 28 encounter with Ms. Ramsey a polygraph examination in order to evade the recording requirements for a custodial interrogation. Pursuant to USPS OIG policy, special agents are required to electronically record custodial interviews. USPS OIG Policy 314.6 (on file with the Court). Contemporaneous electronic recording is not required, however, for the pre-interview component of polygraph examinations. *See* USPS OIG Policy 385.7 (on file with the Court). Under defense counsel's argument, Agent Strasser had no intention of administering the data collection component of the polygraph examination on January 28 but classified his encounter with Ms. Ramsey as a polygraph examination to avoid his obligation to record the interrogation. As an initial matter, I have already found, based on the record, that Agent Strasser intended to administer the polygraph examination in full on January 28. Moreover, it is not clear to this court how Agent Strasser's decision to not electronically record or take contemporaneous notes on January 28 would go to the voluntariness of Ms. Ramsey's waiver. Finally, while there are prudent reasons to require the recording of all custodial interviews—which include enabling a full and fair evaluation of the interview by the courts—such a decision is not for this court to make.

who terminated the interrogation. *Id.* at 126:9−10. Finally, at the February 3 hearing, Agent Strasser testified that while questioning Ms. Ramsey, he never threatened Ms. Ramsey, promised her anything, or raised his voice. *Id.* at 125:20−126:2. Based on this evidence and in the absence of specific allegations by Ms. Ramsey as to the circumstances of the January 28 interrogation, *see* Ramsey Decl. (describing the conference room but not otherwise proffering information about her January 28 interrogation), I find that the government has satisfied its burden of demonstrating that Ms. Ramsey's waiver was knowing and voluntary. Accordingly, Ms. Ramsey's Fifth Amendment violation fails.[7]

## CONCLUSION[8]

Because I find that Ms. Ramsey's Fourth and Fifth Amendments rights were not violated during her encounters with USPS OIG agents on January 2 and January 28, her Motion to Suppress statements made on these dates is denied.

SO ORDERED.

/s/
Allyne R. Ross
United States District Judge

Dated:  February 23, 2022
        Brooklyn, New York

---

[7] Because I find that Ms. Ramsey's Fourth and Fifth Amendment rights were not violated across her January 2 and January 28 interrogations, I do not address defense counsel's argument that Ms. Ramsey's January 28 statements were obtained through an improper two-step interrogation method. *See* Suppression Motion 17−20.

[8] Ms. Ramsey has requested permission to file under seal Exhibits C−E and H in support of her motion. Letter, Jan. 14, 2022, ECF No. 22. At the February 3 hearing, it was decided that defense counsel would instead redact sensitive information contained in these exhibits. Tr. 189:14–190:13. Defense counsel is reminded to submit its proposed redactions to this court and the government.