UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

- v. - :

GERMAINE RAMSEY, : **21-CR-495-ARR**

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MS. RAMSEY'S MOTION *IN LIMINE***
**TO PRECLUDE EXPERT TESTIMONY**

**Nora K. Hirozawa, Esq.**
Attorney for Ms. Ramsey
**Germaine Ramsey**
One Pierrepont Plaza, 16th Fl.
Brooklyn, NY 11201
Tel.: (718) 330-1200

TO: **Breon Peace, Esq.**
United States Attorney
Eastern District of New York
Attn: Nicholas Axelrod, Esq.
Jessica Weigel, Esq.
Assistant United States Attorneys

## I. Introduction

Ms. Ramsey submits the instant motion *in limine* to preclude the government's proposed expert testimony from Communications Intercept Analyst Piotr Orlowski. The government provided notice regarding Mr. Orlowski's proposed expert testimony on February 28, 2023. Because the government's expert notice is patently deficient, Mr. Orlowski's training and experience do not qualify him as an expert, his methodology is unknown, and his findings appear to rest upon the use of tools that have not been recognized as scientifically reliable, Ms. Ramsey moves to preclude to this proposed testimony.

## II. Rule 702 and *Daubert* require rigorous evaluation of the reliability of particular methodologies and how they are applied.

Historical cell site location information evidence is inadmissible unless it is based on a method that is "scientifically valid" and that "properly can be applied to the facts in issue" in a particular case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *accord Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999) (same analysis applies to matters of a technical, rather than a scientific expertise). Federal Rule of Evidence 702, which codified the Supreme Court's holding in *Daubert* and its progeny, governs the admission of expert testimony of a technical or scientific nature. The rule requires the proponent to show:

(1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) the testimony is based on sufficient facts or data;

(3) the testimony is the product of reliable principles and methods; and

(4) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert,* 509 U.S. at 592 n.10 (proponent bears the burden); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Thus, *Daubert* and Fed. R. Evid. 702 require *both* that an expert's testimony be the "product of reliable principles and methods," *and* that the expert "reliably *applied*" the principles and methods to the facts of the case. *Daubert,* 509 U.S. at 597. "Nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 158 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Reliability is thus the touchstone of admissibility under *Daubert. Daubert,* 509 U.S. at 589; *see also United States v. Crisp,* 324 F.3d 261, 268 (4th Cir. 2003). Indeed, because of the power of expert testimony to sway a jury, "it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinion." *United States v. Fultz,* 591 Fed. Appx. 226, 227 (4th Cir. 2015). To guide this inquiry, *Daubert* and its progeny established five factors for assessing the reliability of an expert's proffered opinions:

(1) whether the particular scientific theory "can be (and has been) tested";

(2) whether the theory "has been subjected to peer review and publication";

(3) the "known or potential rate of error";

(4) the "existence and maintenance of standards controlling the technique's operation"; and

(5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

*United States v. Hassan,* 742 F.3d 104, 130 (4th Cir. 2014); *see also Daubert,* 509 U.S. at 593–94. The list is not exhaustive: the Court retains broad latitude to use other factors to measure reliability. *Kumho Tire.,* 526 U.S. at 152.

## III. Background on cell-site location analysis

An overview of cell phone technology is useful for understanding the pitfalls of historical cell-site location analysis, both generally and in this case.

Whenever a cell phone makes or receives a call or text message, the phone communicates, via radio waves, with a cell tower, which exists in a fixed location. *See* Exh. A, Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone*, 18 Rich. J.L. & Tech. 3, 3 (2011) (hereinafter referred to as "Blank"). Each cell tower is divided into sectors, usually an approximately 120-degree wedge, each containing an antenna. The area served by each tower/sector combination is referred to as a "cell," and towers are called "cell sites."




Scientific Working Group on Digital Evidence, Recommendations for Cell Site Analysis, at 9.[1] The center point of each sector is called the "azimuth." The azimuth gives the direction of each sector in degrees, with zero being North.

A given cell site may communicate with a phone up to 30 miles away in rural areas with fewer obstructions. In urban areas, cell towers are typically located closer together, usually reaching phones from one to three miles from the site. Blank at 5. "The number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and man-made) determine the size of each cell's coverage area." *Id.* at 4. Because of these factors, the coverage area for each tower and sector is not uniform. The following map shows estimated coverage areas of each tower and sector in an urban area:

---

[1] Available at https://www.swgde.org/documents/Current%20Documents/SWGDE%20Recommendations%20for%20Cell%20Site%20Analysis




Daniel, Digital Forensics Guide: Cell Phone Location and Tracking Forensics, 2018, at 30.

Cell phone carriers, such as AT&T, Sprint, and Verizon Wireless, keep historical records of cell phone transmissions for their subscribers' phone numbers, commonly called call detail records. Though the information included in call detail records varies somewhat by carrier, the records all show the date, time, and duration of calls, whether they are inbound or outbound calls, the originating tower and sectors for a given transmission, and sometimes the concluding tower and sector for a given transmission. Blank at 10; Scientific Working Group on Digital Evidence, Recommendations for Cell Site Analysis, at 7. In records kept by cell carriers, the sector indicates the direction from which the radio waves are transmitted from the phone, or which antenna the phone uses when it communicates with the tower. *See United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015).

Typically, an expert trained in cell site location analysis will use the call detail records provided by a cell phone carrier to create a map of the towers and sectors used by a cell phone

during voice calls or text messages as proof that the phone was near the location of the tower at the time of the call or text. *See Medley* at 495. The locations of the towers used by a given cell phone do not indicate a precise location for the phone during the transmissions in question; nor do they indicate who was using the phone during any particular transmission. working group paper at 14; Blank at 7-9, 13; Daniel, Digital Forensiscs Guide: Cell Phone Location and Tracking Forensics, 2018, at 7. Rather, using the tower location and the sector information, the experts draw conclusions about the possible general vicinity of a phone during a particular communication or about movement of a phone over time, under the assumption that a phone will often connect with the tower and sector closest to it. This process is called "historical cell-site location analysis." Historical cell site location analysis should not be confused with Global Positioning Systems ("GPS") location, which can pinpoint the location of a phone.

Though historical cell site analysis can show a phone's general location at the time of a recorded transmission, as illustrated above in the figure on page 5, *supra*, the closest tower is not always the tower with the strongest signal. There are many factors that would cause a phone to use a tower other than the closest:

> First, the technical characteristics of cell sites may affect signal strength: (1) the number of sites available; (2) maintenance or repairs being performed; (3) the height of the cell tower; (4) height above sea level; (5) wattage output; and (6) range of coverage. Second, technical characteristics of the antennas on the cellular sites may affect signal strength such as the number of antennas, the angle and direction the antenna is facing, height of each antenna, and call traffic processed through each antenna. Third, technical characteristics of the phone, such as the wattage output and generation of the phone's broadband capacity, may affect signal strength. Fourth, signal strength may depend upon environmental and geographical factors including the weather, topography, and level of urban development. Finally, indoor or outdoor use of the phone may alter the strength of the signal.

Blank at 7.

It is possible for an expert to validate the typical mapping conducted during historical cell site analysis by conducting certain tests and collecting records to determine the actual reach of a particular tower and sector on a given time and date. These analyses include topographic analysis to determine whether there are any natural obstructions in an area, validating the actual geographic

locations of cell sites by visiting the sites, researching network maintenance logs to determine if there were outages at a given time, conducting drive test analyses to map the actual range of a given cell tower after the fact, and several other methods. Minor, *Forensic Cell Site Analysis: A Validation & Error Mitigation Methodology*, Journal of Digital Forensics Security and Law, Volume 11, Number 2 (2017), 33, 36. These types of validation, however, is rare in litigation. A recent analysis of 100 criminal and civil cases showed that no validation was conducted in the vast majority of cases in which cell site location evidence was offered. *Id.* at 36. Without such validation, an expert's testimony necessarily carries certain caveats: An expert cannot say for sure how close to a given tower a phone was located when it connected with the tower or which tower would provide coverage to any particular location.

Call detail records are sometimes available, as they are in this case, for a cell phone's data transmissions in addition to voice and text transmissions. These data transmissions relate to a phone's internet usage, whether through apps, or an internet browser, and include background data usage when a phone user is not actively using the phone. As discussed at greater length below, data transmission records differ from voice and text message transmission records in several key ways: they often include multiple towers used at the same time; towers used are documented in lengthy sessions rather than precise times of use; and the records often show overlapping sessions, which reflect multiple towers and sectors being used simultaneously. For example, call detail records might reflect five or six towers used in the same 60-minute session or one session that begins before the prior session ends, but that reflect different towers and sectors used.

Courts have usually allowed some expert testimony regarding historical cell site location information relating to voice and text transmissions under the *Daubert*/Rule 702 framework, though even in that relatively more reliable context, some have imposed limitations to avoid confusing the jury. *See United States v. Medley*, 312 F. Supp. 3d 493, 495 (D. Md. 2018) (citing *United States v. Jones*, 918 F.Supp.2d 1, 4–6 (D.D.C. 2013); *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016)); *United States v. Evans*, 892 F. Supp. 2d 949, 954-57 (N.D. Ill. 2012). In *Medley*, the court balanced the value of properly analyzed cell site location information with the risk that a jury would "overestimate the

quality of the information provided by this analysis." *Medley*, 312 F. Supp. 3d at 499. The court therefore held that the government's proffered expert could testify as follows:

> I will allow the Government to elicit the opinion from [its expert] that the location of the defendant's cell phone was "consistent with" the location of the crime scene at the time of the carjacking, he may not do so until after he has fully explained during direct examination the inherent limitations of the accuracy of his location evidence— namely, the phone can only be placed in the general area of the cell tower sector that it connected to near the time of the carjacking, and that it cannot be placed any more specifically within that sector. During cross examination, the defendant will be allowed to cross examine [the government's expert] regarding the limitations of the location evidence that he can offer, based on the historical cell call records. As part of this examination, the defendant will be allowed to use any learned treatises regarding the limitations of using historical cell tower billing records to identify the location of a cell phone that are admissible under Fed. R. Evid. 803(18), consistent with the requirements of that rule (the learned treatise content may be read to the jury, but not admitted as an exhibit).

*Medley*, 312 F. Supp. 3d at 499.

## I. The government's expert notice is deficient.

As a preliminary matter, the expert notice is deficient. A district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (expert testimony must be "relevant to the task at hand"). As the Second Circuit stated, "[t]he district court cannot perform [the] complex evaluation of an expert's proposed methodology without a clear articulation of what the expert's opinions are and, even more importantly, of the bases for those opinions." I, 858 F.3d 71, 115 (2d Cir. 2017). Thus, for a court to evaluate an expert's methodology, the proponent of the expert's testimony must comply with Federal Rule of Criminal Procedure 16(a)(1)(G), which requires that a written summary of expert testimony describe the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The purpose of the rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Wilson*,

493 F. Supp. 2d 484, 486-87 (E.D.N.Y. 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment); see also *United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 413318, *5 (S.D.N.Y. Feb. 1, 2015), aff'd 858 F.3d 71 (2d Cir. 2017).

Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government to provide a written summary of any expert testimony it intends to introduce at trial. Fed. R. Crim. P. 16(a)(1)(G). The government's expert notice does not come close to satisfying this rule. It does not disclose the opinions or bases for those opinions that Agent Busick is expected to testify to. This perfunctory disclosure provides no basis for the government—or the Court—to evaluate "what the expert's opinions are and, even more importantly, . . . the bases for those opinions." *Ulbricht*, 858 F.3d at 116. Permitting the government to introduce expert testimony following such a limited disclosure would be inconsistent with Rule 16's aim to "minimize surprise" and "provide . . . a fair opportunity to test the merit of the expert's testimony through focused cross examination." Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment.

It is well settled that Federal Rule of Criminal Procedure 16(d)(2)(C) gives a district court the discretion to preclude expert testimony about any topics or opinions not properly disclosed. *See, e.g.*, *Ulbricht*, 2015 WL 413318 at *5; *United States v. Mahaffy*, No. 05-CR-613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (citing *United States v. Barile*, 286 F.3d 749, 758-59 (4th Cir. 2002)); *United States v. Valle*, No. 12-CR847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013). A court may preclude the testimony as a whole, or any part that it determines was not properly disclosed. *See Mahaffy*, 2007 WL 1213738, at *2.

The government's notice provides draft print exhibits and a video exhibit, states that Analyst Orlowski will explain how cell site location analysis works generally, "identify the particular areas, times, and usage of cellular devices relevant to this case;" "explain the methodology used to create his report," and "explain in detail what the mapping in his report reflects." The notice does not provide any substantive information regarding his methodology or conclusions. Nor do the exhibits illustrate Analyst Orlowski's methodology or his conclusions. Because this notice is patently deficient, the Court should preclude Analyst Orlowski's proposed testimony.

## II. Motion to Preclude Analyst Orlowski's Testimony and for a *Daubert* Hearing

The government will seek to introduce the historical cell-site evidence and analysis through Piotr Orlowski, a Communication Intercept Analyst with the United States Postal Inspection Service. Along with its disclosure of Mr. Orlowski as their proffered expert, the government produced a PowerPoint presentation Mr. Orlowski created that consists of 18 slides and includes 10 demonstrative maps that show the geographic region within which the charged incident allegedly occurred, and still images from a video presentation created using the SyncArena software, as well as a copy of the SyncArena video presentation.

### A. The government's expert notice is deficient.

As a preliminary matter, the expert notice is deficient. A district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (expert testimony must be "relevant to the task at hand"). As the Second Circuit stated, "[t]he district court cannot perform [the] complex evaluation of an expert's proposed methodology without a clear articulation of what the expert's opinions are and, even more importantly, of the bases for those opinions." *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017). Thus, for a court to evaluate an expert's methodology, the proponent of the expert's testimony must comply with Federal Rule of Criminal Procedure 16(a)(1)(G), which requires that a written summary of expert testimony describe the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The purpose of the rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Wilson*, 493 F. Supp. 2d 484, 486-87 (E.D.N.Y. 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment); *see also United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 413318, *5 (S.D.N.Y. Feb. 1, 2015), aff'd 858 F.3d 71 (2d Cir. 2017).

Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government to provide a written summary of any expert testimony it intends to introduce at trial. Fed. R. Crim. P. 16(a)(1)(G). The government's expert notice does not come close to satisfying this rule. The government's notice provides draft print exhibits and a video exhibit, states that Analyst Orlowski will explain how cell site location analysis works generally, "identify the particular areas, times, and usage of cellular devices relevant to this case;" "explain the methodology used to create his report," and "explain in detail what the mapping in his report reflects."

The government's notice does not disclose the opinions or bases for those opinions that Mr. Orlowski is expected to testify to. This perfunctory disclosure provides no basis for the defense—or the Court—to evaluate "what the expert's opinions are and, even more importantly, . . . the bases for those opinions." *Ulbricht*, 858 F.3d at 116. Nor do the exhibits illustrate Analyst Orlowski's methodology or his conclusions. Permitting the government to introduce expert testimony following such a limited disclosure would be inconsistent with Rule 16's aim to "minimize surprise" and "provide . . . a fair opportunity to test the merit of the expert's testimony through focused cross examination." Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment.

Because the government's expert notice is patently deficient, the Court should preclude Mr. Orlowski's proposed testimony.

**B. Mr. Orlowski's training and experience do not qualify him as an expert.**

In addition, the government's notice fails to establish that Mr. Orlowski possesses any scientific or other specialized knowledge that might qualify him as an expert. The government's expert notice indicates that Mr. Orlowski has not testified as an expert in the past four years, and there is no indication that Mr. Orlowski has *ever* been recognized as an expert in any court. Mr. Orlowski's curriculum vitae reflects no formal education in CSLI, data analysis, or mapping. It indicates that he participated in one product-specific training in the past five years, of unknown duration and content. This information does not establish that Mr. Orlowski's possesses any "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand

the evidence or to determine a fact in issue." Fed. R. Evid. 702(1). In fact, it shows that Mr. Orlowski does *not* possess such knowledge. The Court should independently preclude Mr. Orlowski's proposed expert testimony on this basis.

**C. The government has failed to establish that Mr. Orlowski's testimony is the product of reliable principles and methods, and that he reliably applied those principles and methods to the facts of Ms. Ramsey's case.**

The Court should also preclude Mr. Orlowski's testimony because the government has not established that it is based on reliable principles and methods and that those were reliably applied to the facts and data in Ms. Ramsey's case.

Mr. Orlowski appears to rely on SyncArena, a software that defense counsel has never seen used by other cell site location information ("CSLI") experts. The demonstrative exhibits produced by Mr. Orlowski using SyncArena, which include pin-pointed location markers, appear to greatly exceed the conclusions an expert could reach using reliable methods for analyzing CSLI. The government offers no explanation of Mr. Orlowski's methodology, other than that he will "explain the methodology used to create his report" at trial. Notably, the expert exhibits include a video map, which appears to have been produced using software called "SyncArena." The notice does not provide any explanation of how SyncArena figured into Analyst Orlowski's analysis or how SyncArena works. Defense counsel is unaware of any other case where SyncArena has been validated as a reliable scientific tool.

Thus, the government's notice not only fails to establish (1) that Mr. Orlowski actually possesses specialized expert knowledge, it also fails to establish (2) that his testimony is based on sufficient facts or data, (3) that the testimony is the product of reliable principles and methods; and (4) that Mr. Orlowski has reliably applied the principles and methods to the facts of the case.

Because the government's expert notice is patently deficient and fails on all four prongs of Rule 702, the Court should preclude Mr. Orlowski's proposed testimony.

//

//

## III. Conclusion

For the foregoing reasons, the Court should preclude Analyst Orlowski from offering expert testimony at trial.

Respectfully submitted,

_/s/ *Nora K. Hirozawa*_
**NORA K. HIROZAWA**
Attorney for Ms. Ramsey
Federal Defenders of New York

Cc: Nicholas Axelrod (AUSA)
Jessica Weigel (AUSA)