UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                               :

UNITED STATES OF AMERICA,            :      21-CR-495 (ARR)
                               :

    -versus-                             :      <u>NOT FOR ELECTRONIC</u>
                               :      <u>OR PRINT PUBLICATION</u>

GERMAINE RAMSEY,                    :
                               :

            *Defendant*.             :      **OPINION & ORDER**
                               :

------------------------------------------------------------------- :
                               X

ROSS, United States District Judge:

      Before me are (1) the government's motion *in limine* to admit certain evidence and preclude defendant Germaine Ramsey from offering certain evidence; (2) Ms. Ramsey's responses to the government's motion *in limine* and motion to bifurcate her trial; (3) the government's proposed jury charge and Ms. Ramsey's objections thereto and additional proposed charges; and (4) Ms. Ramsey's motion to preclude the government from offering the anticipated expert testimony of Piotr Orlowski.

      For the reasons set forth below, the government's motion *in limine* is granted in part and denied in part; Ms. Ramsey's motion to bifurcate is denied; Ms. Ramsey's objections to the jury charge are upheld in part and denied in part; and Ms. Ramsey's motion to preclude the anticipated expert testimony of Piotr Orlowski is denied.

## BACKGROUND

### *Factual Background*[1]

In late December 2019, a remittance envelope and registry book went missing from a safe at the Metropolitan Station Post Office ("Metro Station") in Brooklyn, New York. The remittance had been deposited in the safe on December 21 and was valued at approximately $7,781.00. Video surveillance from December 22 shows Ms. Ramsey, then a USPS employee, entering the room where the vault containing the safe is located, entering the vault, partially closing the vault's door, standing near the safe, then exiting the room. A short time later, an individual identified by the government as "CC-1" is seen entering the vault and closing the door, then exiting Metro Station approximately ten minutes later.

The loss of the remittance envelope and registry book was investigated by Special Agent Jennifer McInerney, Special Agent Jocelynne Pastrana, and Special Agent and Polygraph Examiner Russell Strasser of the USPS Office of the Inspector General ("USPS OIG"). The USPS OIG agents concluded that CC-1 appeared on Ms. Ramsey's social media pages. Agent McInerney and Agent Pastrana interviewed Ms. Ramsey on January 2, 2020, during which time Ms. Ramsey identified CC-1 as her fiancé and denied participating in or having knowledge of the missing remittance envelope and registry book.

On January 28, 2020, Agents McInerney and Pastrana met Ms. Ramsey outside the Parkville Station Post Office (where Ms. Ramsey typically worked) and drove her to the USPS OIG office at 1050 Forbell Street for additional questioning. There, Agent Strasser met her in a conference room. After Ms. Ramsey considered whether to speak with Agent Strasser for

---

[1] Unless otherwise noted, the facts described in this section are derived from my prior opinion denying Ms. Ramsey's motion to suppress certain evidence. *See* Op. Denying Def.'s Mot. to Suppress ("Suppression Op."), ECF No. 31.

approximately forty-two minutes, she was advised of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and signed a polygraph consent form. According to Agent Strasser's notes of the conversation, Ms. Ramsey admitted that she provided CC-1 with information about where the remittance was located but denied knowing that CC-1 was going to take the money. Ms. Ramsey ultimately ended the interview and left the office. In total, Ms. Ramsey was at 1050 Forbell Street for approximately seven-and-a-half hours, including the forty-two minute period during which she contemplated whether to continue with the interview and an hour-and-a-half lunch break.

*Procedural History*

On June 21, 2021, defendant was charged by complaint with conspiracy to steal United States government property in violation of 18 U.S.C. §§ 641 and 371, *see* ECF No. 1, and on September 22, 2021, a grand jury returned an indictment charging Ms. Ramsey with conspiracy to steal United States government property and with stealing United States government property, *see* ECF No. 6.

On January 12, 2022, defendant moved to suppress her January 2, 2020 and January 28, 2020 statements. *See* ECF No. 21. Following a suppression hearing, I denied her motion to suppress. *See generally* Suppression Op.

On September 19, 2022, a grand jury returned a superseding indictment adding a charge that Ms. Ramsey made false statements to Agents McInerney and Pastrana during the January 2, 2020 interview, in violation of 18 U.S.C. § 1001. *See* ECF No. 36 ("Superseding Indictment"). The false statements identified in the Superseding Indictment are (i) representations that Ms. Ramsey did not help anyone take money and property from the vault at Metro Station, and (ii) her stated reasons for entering the vault at Metro Station. *See id.*

3

On February 13, 2023, the government filed a motion *in limine* in anticipation of trial, seeking to introduce certain of defendant's statements and preclude defendant from introducing certain evidence and argument. *See* ECF No. 41 ("Gov't Mot."). On February 17, 2023, Ms. Ramsey moved to bifurcate trial on Counts One and Two (charging conspiracy to steal United States government property and the substantive offense of stealing United States government property, respectively) from trial on Count Three (charging her with making a false statement), and opposed the government's motion *in limine*. *See* ECF No. 42 ("Def.'s Mot."). The government filed its opposition to the motion to bifurcate on February 22, *see* ECF No. 43 ("Gov't Reply"), and filed its proposed jury instructions on February 27, *see* ECF No. 44 ("Gov't Jury Instr."). Ms. Ramsey filed her objections to the government's proposed jury instructions and supplemental proposed jury instructions on March 2. *See* ECF No. 46 ("Def.'s Jury Objection"). Also on March 2, defendant filed a motion *in limine* to preclude testimony from the government's proffered expert on cell phone location data. *See* ECF No. 47 ("Def.'s Expert Mot."). On March 7, the government filed its opposition to defendant's motion *in limine* to exclude its expert testimony and a supplemental expert disclosure, *see* ECF No. 48 ("Gov't Expert Opp'n"), and its reply in support of its proposed jury instructions, *see* ECF No. 49 ("Gov't Jury Reply").

## DISCUSSION

I.   The Evidentiary Motions

**A. The Government's Motion to Admit Certain of Ms. Ramsey's Statements and Preclude Defendant from Offering Her Own Self-Serving Statements**

The government seeks to admit Ms. Ramsey's statements to the USPS OIG agents on January 2, 2020 and January 28, 2020 under Federal Rule of Evidence 801(c) and Federal Rule of Evidence 801(d)(2)(A). *See* Gov't Mot. 4. The government also seeks to prevent Ms. Ramsey from offering her prior statements to the USPS OIG agents because these statements are inadmissible

hearsay. *Id.* Defendant contends that the statements offered by the government must be supplemented by her other statements under the doctrine of completeness contained in Federal Rule of Evidence 106. Def.'s Mot. 6–7[2].

1.      *Defendant's Own Statements Offered by the Government Are Admissible*

A hearsay statement is one that "the declarant does not make while testifying at the current trial or hearing" and that is offered in evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is not admissible in evidence absent the satisfaction of some hearsay exception, *see* Fed. R. Evid. 802, but a party's own statement offered against her is not hearsay, Fed. R. Evid. 801(d)(2).

Ms. Ramsey does not oppose the admission of her statements, only the exclusion of other statements she made to the USPS OIG investigators. *See generally* Def.'s Mot. 6–11. The government may plainly offer Ms. Ramsey's statements to the USPS OIG agents under Federal Rule of Evidence 801(d)(2)(A), which allows the admission of a statement made by an opposing party. Moreover, Ms. Ramsey's alleged lies to Agents McInerney and Pastrana may be admitted for the fact that they were made. *See* Fed. R. Evid. 801(c)(2).

2.      *The Rule of Completeness Does Not Permit Admission of Defendant's Statements*

Federal Rule of Evidence 106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." The rule requires admission of an omitted statement where the statement is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial

---

[2] Ms. Ramsey's submission did not include page numbers. In citing page numbers throughout this opinion I have identified the pagination from the first page on which substantive argument begins, *i.e.*, I have excluded the cover page.

understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotation marks omitted). An omitted statement that is otherwise hearsay may be "properly introduced to correct a misleading impression or place in context that portion already admitted," which is "a valid, nonhearsay purpose." *United States v. Williams*, 930 F.3d 44, 60 (2d Cir. 2019) (emphasis omitted). However, the rule should not be used to "require introductions of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). Mere allusions by a party to "fairness" or "context" do not satisfy the party's burden to demonstrate why the evidence should be admitted; the party seeking admission must provide "a more specific showing that the government's [intended evidence is] rendered misleading, void of context, or confusing due to the omission of certain [statements]." *United States v. Mohamed*, No. 18-CR-603 (ARR), 2022 WL 15493545, at *3 (Oct. 26, 2022) (holding that the rule of completeness did not require the admission of a defendant's entire message Facebook history based on a mere reference to context "in a very general sense").

In support of her position that various categories of her statements to the USPS OIG agents should be admitted, Ms. Ramsey cites *United States v. Walia*, No. 14-CR-213 (MKB), 2014 WL 3734522, at *8 (E.D.N.Y. July 25, 2014), contending that "courts in this district have admitted exculpatory statements made by a defendant during the same interrogation as inculpatory statements the government seeks to admit." Def.'s Mot. 7. However, the court in *Walia* explicitly reserved decision as to whether or not the government's witnesses would be required to introduce contextualizing statements under Rule 106 and did not purport to follow a categorical rule allowing exculpatory statements to be admitted where they were uttered during the same interrogation as inculpatory statements. *Walia*, 2014 WL 3734552, at *8. Without more, I decline to admit

defendant's statements based solely on a non-specific reference to defendant's desire to provide "context" for her statements.

The government and Ms. Ramsey address three specific categories of purportedly "contextual" statements that Ms. Ramsey wishes to admit under the rule of completeness. I will address each in turn.

*a.   Statements Concerning Ms. Ramsey's Church Attendance on December 22, 2019*

First, Ms. Ramsey contends that her statements to Agent Strasser to the effect that she attended church on the morning that the remittance envelope went missing from Metro Station "are relevant for the purpose of establishing a full timeline of her actions and movements during the time period at issue in this case." Def.'s Mot. 9. Ms. Ramsey argues that because this statement was true, failing to admit it would "unfairly mislead the jury into inferring that Ms. Ramsey's entire narrative [to Agent Strasser] about that morning was false." *Id.* Ms. Ramsey contends that the jury needs to be presented with the full conversation in part because she is charged with making false statements. *Id.* (citing *United States v. Castro*, 813 F.2d 571, 576 (2d Cir. 1987)).

I decline to allow Ms. Ramsey to stretch the rule of completeness to introduce "portions of [her] statement[s] that are neither explanatory of nor relevant to the admitted passages." *Marin*, 669 F.2d at 84. "[A] party cannot circumvent the hearsay rule simply by invoking the doctrine of completeness so as to render otherwise inadmissible evidence admissible for its truth." *Williams*, 930 F.3d at 60. And, of course, only relevant evidence is admissible. Fed. R. Evid. 402; *see* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). The fact that Ms. Ramsey attended church on the morning of December 22, 2019 lends no context to the statements that the government seeks to admit. Her argument that the jury would be misled into thinking all of her statements were false is both speculative and legally spurious—

7

to prove Count Three, the government must show specific statements that were false, not that Ms. Ramsey was generally dishonest during her January 2, 2020 interview. *See* Superseding Indictment, Count 3 (identifying two false statements); Gov't Jury Instr. 32 ("The government is required to prove beyond a reasonable doubt that the defendant made a statement with a substantially similar meaning to the one alleged in the statement as I read [in] the Indictment to you."). Ms. Ramsey's statement that she attended church on December 22, 2019 has no bearing on any of her statements the government seeks to introduce. *See* Gov't Reply 8–9 (list of defendant statements the government intends to admit).

b. *Statements Concerning Ms. Ramsey's Post Office Service and Tenure*

Ms. Ramsey next argues that the statements she made to Agent Strasser concerning her lengthy tenure with the Post Office should be admitted as "necessary context to the narrative of this case and [their] relevan[ce] to motive." Def.'s Mot. 10. Again, the repeated invocation of "context"—without more connecting her statement about tenure to a statement the government seeks to introduce—fails to satisfy the requirement that the statement either explain or be relevant to a statement the government seeks to introduce. Ms. Ramsey argues that her "assertion that she had 'too many years on the job' came shortly after she denied taking money from the safe." *Id.* Although a defendant's lack of motive to commit the crime charged is no doubt relevant, Ms. Ramsey cannot introduce what is otherwise inadmissible hearsay merely because it is relevant.

c. *Statements Concerning CC-1's Abusive Behavior*

Finally, Ms. Ramsey argues that she is entitled to admit statements about CC-1's alleged abuse. The government seeks to admit Ms. Ramsey's statements that during one of her interviews she "deleted something private on her cell phone between her and CC-1," which both parties suggest were text messages. Gov't Reply 9. Ms. Ramsey argues that her statement that CC-1 abused her is relevant "context" to explain her action in deleting these text messages, and also that

8

"statements regarding CC-1's abusive nature are relevant and critical to both the narrative and the jury's credibility assessment of Ms. Ramsey's statements." Def.'s Mot. 11. This latter argument is simply a rehash of the type of vague references to "context" that I have already noted do not satisfy Rule 106. Further, based on Agent McInerney and Agent Strasser's interview notes from the January 2 and January 28 interviews, respectively, I find that the explanation that CC-1 is abusive is not necessary to contextualize the agents' questioning regarding Ms. Ramsey deleting communications between herself and CC-1. Agent McInerney observed the deletion during the January 2, 2020 interview and asked Ms. Ramsey what she had deleted. *See* 3500-JM-3 at GR000005. Ms. Ramsey responded that she had deleted "something private" between her and CC-1. *Id.* Agent McInerney then asked Ms. Ramsey what CC-1 did for a living, and Ms. Ramsey responded that CC-1 does handiwork and receives Social Security. *Id.* at GR000006. There is no indication from Agent McInerney's notes that Ms. Ramsey stated that CC-1 was abusive at any time during the January 2, 2020 interview, much less in the context of her statement that she was deleting "something private" between her and CC-1. Ms. Ramsey only told the USPS OIG investigators that CC-1 was abusive during the January 28, 2020 interview. *See* 3500-RS-1 at GR000013. And this statement was seemingly unconnected to any question about the deletion of information from her cell phone. *See id.* at GR000012. Therefore, defendant has not identified an adequate foundation to show that Ms. Ramsey's statement that CC-1 is abusive contextualizes Ms. Ramsey's deletion of the text messages.

### B. Ms. Ramsey Is Precluded from Offering Certain Evidence or Argument Concerning Her Criminal History and Personal Background

I have already ruled that Ms. Ramsey's statements concerning her church attendance, tenure with USPS, and CC-1's alleged abuse are not admissible pursuant to Rule 106. The parties separately dispute the admissibility of evidence on these topics, in any form.

As I noted in my discussion of the Rule 106 issue, Ms. Ramsey's tenure with USPS is relevant. Evidence is relevant if it has a tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Fed. R. Evid. 401. The fact that Ms. Ramsey was a long-tenured employee of USPS tends to make the fact of her participation in the alleged conspiracy to steal from her employer marginally less likely because it goes to her motive to commit the charged crimes. Ms. Ramsey may therefore introduce evidence concerning her tenure if it is in an admissible form; I have already ruled that her prior statements to the USPS OIG agents on this topic are inadmissible hearsay.

However, defendant's church attendance on December 22, 2019 and in general is wholly irrelevant because it is not "of consequence in determining the action." Fed. R. Evid. 401(b). Her whereabouts beyond the time she was working at Main Street on December 22, 2019 are not at issue, and any attempt to introduce evidence that Ms. Ramsey frequently attends church is inadmissible because it is character evidence offered via a specific instance of conduct. *See* Fed. R. Evid. 405(a).

The government argues that evidence of Ms. Ramsey's relative lack of prior convictions or arrests[3] should only be admissible insofar as it bears on her credibility if she testifies. Gov't Mot. 16. Ms. Ramsey does not respond directly to the government's point other than to contend that the evidence of her lack of criminal record should be admitted. Def.'s Mot. 11. A testifying witness may testify as to her own lack of criminal record, because this information has some relevance to her credibility. *See United States v. Blackwell*, 853 F.2d 86, 87–88 (2d Cir. 1988) (noting that this evidence is admissible but may be of "low probative value"). Ms. Ramsey may introduce her lack of criminal record as background should she testify in this case. However, she

---

[3] Ms. Ramsey was convicted of misdemeanor petit larceny in 1984. Gov't Mot. 15 n.7.

may not introduce this evidence as a means of encouraging a propensity inference, *i.e.*, she may not point to her lack of criminal record to prove that she acted in accordance with her lack of criminal history. *See* Fed. R. Evid. 404(a)(1); *United States v. Inniss*, No. 18-CR-134 (KAM), 2019 WL 6999912, at *8 (E.D.N.Y. Dec. 20, 2019) (permitting testimony regarding defendant's good character in the form of reputation evidence "without reciting . . . the lack of bad acts").

Finally, with respect to the general admissibility of evidence that CC-1 abused Ms. Ramsey, the government contends that the only theory upon which these facts would be relevant is if defendant claims that she provided CC-1 with information about the Main Street USPS office under duress, rather than as a willing conspirator. Gov't Mot. 17. Ms. Ramsey's arguments focus solely on the question of whether Rule 106 allows her to introduce this evidence, again reiterating that the alleged abuse "is relevant to contextualizing her statements and conduct during the interrogations." Def.'s Mot. 12. Defendant has not clarified whether she intends to introduce a duress defense or otherwise argue that she was pressured by CC-1 into committing criminal acts, only that she "will not present irrelevant information regarding . . . personal family circumstances that is not probative of any fact related to this case, solely to generate sympathy." *Id.* At this juncture, there is no evidence that Ms. Ramsey acted under duress. *See United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (noting that the elements of a duress defense include (1) a threat of force directed at the time of the defendant's conduct; (2) sufficient to induce a well-founded fear of death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape and precluding evidence of mere "pressure[]" where the defendant "made no attempt to make a showing as to any of these elements"). The proponent of evidence has the burden of proof on its admissibility, and I find that defendant has failed to explain why the fact that CC-1 allegedly abused her is generally admissible.

### C. Defendant May Not Inform the Jury that CC-1 Has Not Been Charged

The government moves to preclude Ms. Ramsey from offering evidence or argument that would inform the jury that CC-1 has not been charged. Gov't Mot. 6. Defendant replies that she is entitled to present evidence and argue to the jury that CC-1 is culpable for the charged offenses. Def.'s Mot. 13 (citing *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) ("The accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged." (quotation omitted))). Although defendants may admit evidence to show that someone else committed the crime with which they are charged, evidence that CC-1 *has not* been charged does not fit this description. As Ms. Ramsey acknowledges, she and CC-1 are alleged to have entered into a conspiracy in which Ms. Ramsey provided CC-1 information that CC-1 then used to steal the remittance envelope and registry book. *See* Def.'s Mot. 13. This is a far cry from the scenario in *Holmes*, in which the defendant-petitioner had been prohibited from calling multiple witnesses who would have identified another perpetrator entirely. *Holmes*, 547 U.S. at 323–24. *Holmes* did not involve an attempt to alert the jury to the fact that an alleged co-conspirator had not been charged by the government. I do not see how the government's charging decision with respect to CC-1 makes it any more or less probable that Ms. Ramsey is innocent of the crimes charged.

Ms. Ramsey also argues that "the government's failure to charge CC-1 is relevant to the jury's assessment of the investigation conducted by law enforcement in this case and the credibility of law enforcement witnesses who may be called to testify at trial." Def.'s Mot. 13. This argument attempts to track the holding in *United States v. White*, 692 F.3d 235 (2d Cir. 2012), cited by Ms. Ramsey. In *White*, the Second Circuit eschewed a "categorical rule" regarding the admissibility of charging decisions, instead holding that "[d]istrict courts may not automatically exclude such evidence without an inquiry into its relevance and probative value." 692 F.3d at 245–46. However,

the facts in *White* are distinguishable from the facts in this case. In *White*, the evidence that other defendants had been charged in state court was "central to the defendant's claim of innocence" and tended to show that a firearm had not been found in his pocket, contradicting law enforcement's testimony that a firearm was found on White's person. *Id.* Here, Ms. Ramsey wishes to introduce evidence that CC-1 has *not* been charged, as evidence going to the "credibility" of USPS OIG investigators who, it is undisputed, do not have the power to indict CC-1. On the facts before me, the fact that CC-1 has not been charged is not relevant to either law enforcement credibility or the conduct of the USPS OIG investigation.

Even if the fact that CC-1 has not been charged was relevant to law enforcement credibility, the probative value of this evidence would be minimal. At best, introduction of this evidence to challenge law enforcement's credibility would call upon law enforcement witnesses to speculate about why CC-1 was not charged, since they do not have charging authority. And that probative value is substantially outweighed by a danger that the jury would be confused or misled into believing that CC-1 was not charged because the government believes him to be innocent. *See* Fed. R. Evid. 403; *United States v. Hill*, No. 12-CR-214 (KAM), 2014 WL 198813, at *2 (E.D.N.Y. Jan. 14, 2014) (denying admission of evidence concerning prior charging decision on Rule 403 grounds).

### D. The Government May Admit CC-1's Prior Convictions as Direct Evidence Supporting *Pinkerton* Liability

The government has moved to introduce CC-1's prior convictions for burglary and theft as direct evidence of the crimes charged against Ms. Ramsey, or, in the alternative, pursuant to Federal Rule of Evidence 404(b).

1.    *Legal Standard*

Where uncharged acts are "inextricably intertwined" with or "ar[i]se out of the same transactions as the charged acts," these prior acts may be introduced as direct evidence despite Rule 404(b)(1)'s prohibition on the admission of evidence of prior bad acts for a propensity inference. *See United States v. Edwards*, 723 F. App'x 48, 50 (2d Cir. 2018) (quotation omitted) (admitting direct evidence of defendant's cocaine dealing in heroin conspiracy case where defendant dealt his co-conspirators both drugs and his relationship with co-conspirators was formed in part because of his distribution of both drugs). Uncharged acts may also be introduced as direct evidence where they are probative to "present[] an intact narrative" to a jury and are not unduly prejudicial. *See United States v. Bloom*, 366 F. App'x 285, 288 (2d Cir. 2010) (admitting evidence that defendant had previously attempted to murder his spouse as part of the "inception of [defendant's] murder-for-hire plot"). Such evidence is often admitted as direct evidence where a co-conspirator's criminal background rebuts a defendant's assertion of ignorance. *See, e.g.*, *United States v. Santoro*, 302 F.3d 76, 82–83 (2d Cir. 2002) (upholding admission of evidence of co-conspirator ties to organized crime where defendant claimed ignorance of the illegality of his actions); *United States v. Reifler*, 446 F.3d 65, 92 (2d Cir. 2006) (same).

Under a *Pinkerton* theory of liability, the government will have to demonstrate that CC-1's "substantive crimes . . . were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if [Ramsey] did not [her]self participate in the substantive crimes." *United States v. Romero*, 897 F.2d 47, 51 (2d Cir. 1990) (quotation omitted).

2.    *Discussion*

The government wishes to admit evidence of CC-1's prior crimes as direct evidence because because it is "background to the charged conspiracy to explain the relationship of trust between conspirators" and also "to explain how the defendant knew she could conspire with CC-

1 and that CC-1 was willing and able to carry out their plan." Gov't Mot. 9. However, the government primarily relies upon cases in which a defendant admitted to committing the charged acts but asserted ignorance of illegality and the government introduced evidence of a co-conspirator's criminal background to rebut this assertion. *See id.* at 9–10. These cases are inapposite to the government's proffered reasons for admitting CC-1's bad acts as direct evidence against Ms. Ramsey, namely, to explain the "relationship of trust" between them and Ms. Ramsey's alleged knowledge that she could conspire with CC-1. Defendant notes that she has no "intention to argue that [she] engaged in the conduct as charged but did not believe that it was illegal." Def.'s Mot. 15. CC-1's prior actions—six theft offenses and three burglary offenses—are not "inextricably intertwined with" the charges Ms. Ramsey faces, nor has the government offered any evidence that CC-1's prior crimes "ar[i]se out of the same transactions as" the acts charged here. *Edwards*, 723 F. App'x at 50. The government has not carried its burden to admit CC-1's prior convictions as direct evidence on the grounds that they are "background" or "inextricably intertwined" with the alleged conspiracy.

The government has shown, however, that this evidence should be admitted directly to support a *Pinkerton* theory of Ms. Ramsey's offenses. The government contends that part of its proof that CC-1's actions were reasonably foreseeable to Ms. Ramsey "is based on the defendant's knowledge of CC-1's sordid past." Gov't Mot. 10. Defendant argues that the government has insufficiently supported its argument by basing it on one comment by Ms. Ramsey to the effect that CC-1 "is not proud of what he does," which is insufficient to assume Ms. Ramsey's knowledge of his criminal history. Def.'s Mot. 15–16. I would find for defendant if this ambiguous remark were the only item the government relied upon, but the government also notes that Ms. Ramsey told the investigators that she and CC-1 were in a romantic relationship, lived together, and had

15

known each other for 20 years. This evidence, although circumstantial, is enough to support the inference that Ms. Ramsey had knowledge of CC-1's criminal history, and, therefore, the government may offer evidence of CC-1's criminal history for the purpose of showing that his actions were reasonably foreseeable.

Because I rule that CC-1's criminal history is admissible as direct evidence, I do not consider the parties' arguments as to whether his past acts are admissible under Rule 404(b).

Finally, Ms. Ramsey argues that the evidence of CC-1's crimes is unduly prejudicial and should be excluded under Rule 403. To exclude this evidence, I must find the probative value of the evidence substantially outweighed by its potential for unfair prejudice to defendant. Fed. R. Evid. 403; *United States v. Barret*, 677 F. App'x 21, 24 (2d Cir. 2017). I find that Rule 403 does not bar the admission of the evidence of CC-1's prior crimes. First, the evidence is highly probative—the government does not contend that Ms. Ramsey herself stole from the Metro Station vault, but that she enabled CC-1 to do so, knowing that he would steal. Knowledge of CC-1's criminal background is highly relevant to Ms. Ramsey's state of mind. Second, although I appreciate Ms. Ramsey's concerns that information about CC-1's criminal record might encourage the jury to find her guilty by association or mislead the jury into thinking that she was involved with CC-1's prior offenses, such concerns may be ameliorated by an appropriate jury instruction, *see infra*.

### E. Defendant May Not Argue that Her Statements to Agent Strasser Were Not Knowing and Voluntary, But May Argue They Were Not Credible

The government moves to preclude Ms. Ramsey from re-litigating the issue of whether her January 28, 2020 statements to Agent Strasser were knowing and voluntary. Gov't Mot. 10. Ms. Ramsey asserts that she should be permitted to give evidence on the issue of voluntariness pursuant

to 18 U.S.C. § 3501(a) and that the Fifth and Sixth Amendments entitle her to present evidence of the circumstances of her statements. Def.'s Mot. 20.

As an initial matter, defendant's papers do not clearly describe whether she intends to litigate the voluntariness of her January 2, 2020 and January 28, 2020 statements, their credibility, or both. Ms. Ramsey contends that "[t]he circumstances of Ms. Ramsey's interrogations are directly relevant to the jury's assessment of how much weight the statements should be given," *i.e.*, a question of credibility, but also that I should "permit the jury to hear relevant evidence on the issue of voluntariness" pursuant to 18 U.S.C. § 3501(a). Def.'s Mot. 20. As I read the government's motion and reply, it does not dispute Ms. Ramsey's right to offer evidence concerning the credibility of her confession. Although the government argues that "the circumstances of the defendant's statements . . . are irrelevant to the limited factual questions for the jury," Gov't Mot. 11, if Ms. Ramsey admits competent evidence that impeaches the credibility of her inculpatory statements, that evidence is plainly relevant, *see Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (holding that the Sixth Amendment is violated when a defendant is precluded from describing the circumstances in which a confession was made where that description goes to the *credibility* of the confession, even if the defendant "marshal[s] the same evidence earlier in support of an unsuccessful motion to suppress" dealing with the legal question of whether the confession was *voluntary*). Accordingly, Ms. Ramsey may admit evidence bearing on the credibility of her confession. *See United States v. Morel*, 751 F. Supp. 2d 423, 429 (E.D.N.Y. 2010) (holding that defendant was entitled to introduce evidence going to the credibility of his confession, regardless of prior suppression order finding that the statements were voluntary).

Moving to voluntariness, the government is correct that evidence concerning the voluntariness of a statement may only be admitted under 18 U.S.C. § 3501(a) where the statement

was made "during interrogation following arrest or detention." Gov't Reply 5 (quoting *United States v. Stevens*, 83 F.3d 60, 67 (2d Cir. 1996)). Accordingly, to allow evidence concerning the voluntariness of Ms. Ramsey's confession, I must determine whether she was arrested or detained when the statements were made. *See United States v. Kourani*, 6 F.4th 345, 354 (2d Cir. 2021) ("Because [the defendant] had not been arrested or detained when he made the statements at issue during the 2017 meetings, the District Court was not required to instruct the jury on [the defendant's] confessions in accordance with [18 U.S.C. § 3501(a)]."). I have already found that the January 2, 2020 interview of Ms. Ramsey was not custodial. Suppression Op. 7. Accordingly, I preclude Ms. Ramsey from further contesting the voluntariness of her January 2, 2020 statements. I have not previously addressed whether Ms. Ramsey was in custody when she made the statements on January 28, 2020.

Whether a person is in custody is "determined based on how a reasonable person in the suspect's situation would perceive her circumstances." *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (alteration omitted) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004)). The test is an objective one, which "eschews consideration of intent and involves an essentially legal assessment of whether the particular circumstances would warrant the belief that a person has been detained." *United States v. Montilla*, 928 F.2d 583, 588 (2d Cir. 1991). The test "asks (1) whether a reasonable person would have thought [s]he was free to leave the [law enforcement] encounter at issue and (2) whether a reasonable person would have understood [her] freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal quotations and citations omitted). Factors to be considered include: (1) the duration of the interrogation; (2) its location; (3) whether the suspect volunteered

for the interview; (4) whether restraints were used; (5) whether weapons were present and/or drawn; and (6) whether officers told the suspect she was free to leave. *See id.*

Based on these factors, I conclude that Ms. Ramsey was not in custody when she made the January 28, 2020 statements. Accordingly, she is precluded from presenting evidence concerning the voluntariness of her January 28, 2020 statements to the jury.

First, although Ms. Ramsey spent a total of seven-and-a-half hours at the USPS OIG office at 1050 Forbell Street, not all of this time was spent under interrogation. As discussed in connection with defendant's motion to suppress, Ms. Ramsey spent about forty-two minutes deciding whether to speak with agents and approximately an hour-and-a-half at lunch, following a break that Ms. Ramsey herself requested. Suppression Op. 15, 18. Second, there is no evidence that at any point on January 28, 2020 Ms. Ramsey was handcuffed, nor were any of the agents' firearms visible. *See generally* Suppression Hr'g Tr., ECF No. 35. Finally, Agent Strasser testified that he advised Ms. Ramsey five times that proceeding with his questioning was voluntary, and Ms. Ramsey in fact decided to end the interrogation. Suppression Op. 18–19. Although Ms. Ramsey was interrogated at the USPS OIG office rather than at her own place of employment, there was no dispute at the suppression hearing that Ms. Ramsey was there of her own volition. Taken together, a reasonable person would not have understood her freedom of action to have been curtailed to a degree associated with formal arrest. Accordingly, Ms. Ramsey was not in custody on January 28, 2020 and she may not re-litigate the voluntariness of her statements.

### F.  The Motion to Limit Cross-Examination of Agent Strasser

The government moves to prevent Ms. Ramsey from cross-examining Agent Strasser about (i) a 2011 complaint made by a union representative about Agent Strasser's allegedly improper behavior during an interview of a USPS clerk, and (ii) Agent Strasser's participation in a series of

books and other media appearances titled "Forensics for Fiction" under the pen name "Geoff Symon." Gov't Mot. 13–14.

Ms. Ramsey represents that the government has not fully disclosed materials relating to Agent Strasser's appearances as Geoff Symon. Def.'s Mot. 21. I agree with defendant that before I can rule on the scope of cross-examination, the government must complete disclosing *Giglio* material relating to Agent Strasser's appearances as "Geoff Symon" on podcasts, at talks, or via YouTube videos. The government is directed to disclose this information on or before 12 p.m. on Thursday, March 16, 2023, and defendant shall advise by a letter of no more than three pages whether she intends to cross-examine Agent Strasser on any of the Geoff Symon materials, on or before 12 p.m. on Friday, March 17, 2023.

In substance, the 2011 complaint against Agent Strasser was that he repeatedly tried to convince the USPS clerk he was interviewing to take a polygraph, and, when the clerk's union representative directed the clerk not to participate, Agent Strasser raised his voice and moved his chair closer to the union representative. Gov't Mot. 13. The USPS OIG concluded that an investigation into Agent Strasser's conduct was not warranted and verbally discussed the alleged issue with him. *Id.*

Rule 608 provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). However, I may allow cross-examination on specific instances of conduct "if they are probative of the character for truthfulness or untruthfulness of[] the witness." *Id.* 608(b)(1). Ms. Ramsey argues that she wishes to cross-examine Agent Strasser on the 2011 complaint because the allegations concern "some of the same interrogation tactics . . . in his interrogation of Ms. Ramsey." Def.'s Mot. 22. In particular, she notes that the same agents involved in the 2011

interrogation interrogated Ms. Ramsey and that both interrogations involved an agent in another room listening to the interrogation. *Id.*

I do not see how these similarities bear at all upon Agent Strasser's character for truthfulness. Although the 2011 complaint describes certain investigative techniques used by Agent Strasser, the gravamen of the complaint was Agent Strasser's alleged behavior, not any interrogation technique. The mere fact that there was an investigation into Agent Strasser that discussed certain of his techniques, without more, has no probative value as to Agent Strasser's character for truthfulness or untruthfulness. Accordingly, I will not allow cross-examination on the 2011 complaint pursuant to Rule 608(b). Ms. Ramsey may cross-examine Agent Strasser on his interrogation techniques generally.

### G.  Ms. Ramsey May Not Introduce Evidence or Argument Concerning Her Retirement from USPS

In June of 2020, the USPS issued Ms. Ramsey an advance notice of proposed removal. Gov't Mot. 15. Before her termination became effective, Ms. Ramsey voluntarily retired from the USPS. *Id.* The government moves to preclude Ms. Ramsey from offering any evidence of the consequences she has already suffered as a result of investigations into the missing remittance. Ms. Ramsey only lightly resists the government's motion, arguing that Ms. Ramsey's ultimate retirement is "part and parcel of the overall narrative" and that allowing the jury to believe that Ms. Ramsey remains at the USPS would "unnecessarily mislead the jury." Def.'s Mot. 23. I agree that the collateral consequences of Ms. Ramsey's alleged conduct are irrelevant. Ms. Ramsey's employment status is not of consequence to this action and defendant may not introduce evidence of it. *See* Fed. R. Evid. 401.

II.     Ms. Ramsey's Motion to Bifurcate Counts One and Two from Count Three Is Denied

A.  **Legal Standard**

Federal Rule of Criminal Procedure 8(a) allows for joinder of separate offenses "if the offenses charged . . . are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." However, the Federal Rules permit that properly joined offenses may be separated "[i]f the joinder of offenses . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). The justification for joinder of offenses under Rule 8(a) is that joinder of claims with common evidence preserves judicial economy, and, as a result, some prejudice "presumably is countenanced by that provision." *United States v. Villanueva Madrid*, 302 F. Supp. 2d 187, 190–91 (S.D.N.Y. 2003). Accordingly, a defendant seeking to separate the trial of common offenses "carries a heavy burden of showing that joinder will result in *substantial* prejudice." *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994) (emphasis added) (internal quotations omitted). Typically, "'less drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (alterations in original) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

In considering whether to separate counts, courts routinely evaluate whether the evidence admissible as to the count sought to be bifurcated would be admissible as evidence of the other charged counts. *See, e.g.*, *United States v. Sweig*, 441 F.2d 114, 118–19 (2d Cir. 1971) (upholding denial of severance where "[v]irtually every overt act alleged in the conspiracy count formed the subject matter of one of the eight perjury counts, and would therefore be admissible in a perjury trial to show the falsity" of the defendant's statements); *United States v. Feola*, 651 F. Supp. 1068, 1121–22 (S.D.N.Y. 1987) (denying severance where prior drug conviction evidence for felon-in-possession count could have been used as evidence for other drug counts), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

### B. Discussion

Ms. Ramsey relies on the Second Circuit's holding in *United States v. Jones*, 16 F.3d 487 (2d Cir. 1994), to analogize to the charges she faces. In *Jones*, the Second Circuit ruled that there was an "inevitable spillover effect occasioned by proof of [the defendant's] tawdry [criminal] record," such that there was unfair prejudice to the defendant in being tried on both a felon-in-possession count and counts of bank robbery. *Id.* at 492. Also at issue was the court's charge, during which the judge properly reminded the jurors not to consider the defendant's prior felony convictions on the bank robbery charges, but also "reminded the jurors repeatedly that [the defendant] was a convicted felon." *Id.* at 493. The Second Circuit determined that the jury could not perform these "mental acrobatics" and that there was "an overwhelming probability that the jurors did not adhere to the court's instructions." *Id.* Ms. Ramsey asks me to conclude that there would be an "inevitable spillover effect" from joining Counts One and Two with Count Three. She notes that the government will likely introduce evidence of her prior statements—including those identified in Count Three—as evidence to support Counts One and Two. In Ms. Ramsey's view, this linkage will imply to the jury that she is not credible. *See* Def.'s Mot. 4.

Ms. Ramsey's arguments merely repeat the often-acknowledged "danger that a jury will cumulate evidence [that] is inherent in *any* joinder of similar acts under [Federal Rule of Criminal Procedure] 8(a)." *Villanueva Madrid*, 302 F. Supp. 2d at 190. Here, it is apparent that defendant's allegedly false statements would be admissible as evidence of the charges of conspiracy and conversion of government property, and proof of the conspiracy and conversion are admissible as evidence that defendant made false statements to investigators. The mere fact that there will be shared evidence between the counts does not satisfy defendant's "heavy burden" in showing that the joinder of her counts creates "substantial prejudice." *Amato*, 15 F.3d at 237. And unlike in

*Jones*, the evidence of an alleged false statement in this case is not "of the inflammatory sort" that would necessitate severance of the counts. 16 F.3d at 493.

Ms. Ramsey's motion to bifurcate is denied.

III.    The Jury Charge

I have reviewed the government's requested jury instructions, defendant's objections and proposed additional jury instructions, and the government's response to defendant's objections. I am appending my draft jury charge ("Draft Jury Instr.") to this opinion. In drafting the jury charge, I relied upon the parties' submissions and objections as well as recent jury charges I have used that, *inter alia*, contained pertinent general instructions and instructions on conspiracy, aiding and abetting liability, and *Pinkerton* liability. I have also made readability and wording edits to the parties' proposed instructions where appropriate. The parties are directed to file any supplemental objections on or before 12 p.m. on Monday, March 20, 2023.

**A. General Instructions**

Ms. Ramsey objects to the government's proposal that I include a "No Questioning Wisdom of Law" instruction, Gov't Jury Instr. 1(b), as well as the "Permissible Inferences Drawn from the Evidence" instruction, Gov't Jury Instr. 1(j). I will instruct that it is the jury's duty to find the facts, but that jurors must apply the law in accordance with my instructions. Draft Jury Instr. 1–2. I will also instruct the jury under the "Direct and Circumstantial Evidence" instruction that "you are permitted to draw, from facts that you find have been proven, such reasonable inferences or conclusions as seem justified in light of your experience and common sense." *See* Draft Jury Instr. 6. I believe these are sufficient instructions to address defendant's concerns.

Ms. Ramsey also requests that I add two standard instructions concerning defendant's election not to testify and the use of demonstrative exhibits. Def.'s Jury Objection 9–10. I have

added these instructions to my draft jury charge under the headings "Defendant's Right Not to Testify" and "Charts and Summaries."[4] *See* Draft Jury Instr. 17–18.

Finally, Ms. Ramsey requests that I issue preliminary instructions, a credibility of witness instruction, and closing instructions regarding implicit bias, based on the instructions used in the Western District of Washington. Def.'s Jury Objection 9–10 & Ex. A. The government opposes giving a preliminary instruction or pre-opening instruction concerning unconscious bias but has revised its proposed instructions on juror prejudice to incorporate some of defendant's proposed language concerning unconscious bias. *See* Gov't Jury Reply 4–5 & n.2. The parties anticipate a preliminary instruction replacing Government Instruction Nos. 6 & 7[5], which refer with less specificity to bias and prejudice.

Based on the parties' submissions, I have drafted a general instruction advising the jury that sympathy and bias, including unconscious bias, are not permissible grounds for a verdict, but decline to offer an instruction on unconscious bias before the close of evidence. *See* Draft Jury Instr. 7. I believe this instruction is sufficient to cover any potential jury biases, conscious or unconscious.

## B. Government Instruction No. 2

Ms. Ramsey asks that I strike all references to the "Superseding Indictment" in favor of simply referring to the "Indictment." I have done so throughout my draft. *See generally* Draft Jury Instr.

---

[4] The government has not advised whether it will seek to admit charts and summaries into evidence. My draft instruction assumes the government has not admitted the charts and summaries themselves into evidence. I will modify the instruction should the government advise that it wishes to admit certain charts and summaries into evidence.

[5] For the sake of clarity, each time I refer to an instruction from the government's proposed jury charge, I will refer to it in the above format.

Ms. Ramsey also asks that I supplement Government Instruction No. 2 to clarify that the indictment is not itself evidence. This point is made throughout the draft instructions. *See, e.g.*, *id.* at 2, 19.

### C. Government Instruction No. 3

Defendant contends that the Government Instruction No. 3 ("Persons Not On Trial") is erroneous because "[t]he jury may consider [CC-1's] absence, just like the absence of other evidence, in assessing the strength of the government's case and the extent of the investigation undertaken by law enforcement." Def.'s Jury Objection 2. In this opinion, I have ruled that the government's charging decision with respect to CC-1 is, at best, marginally relevant, and if admissible would be highly confusing to the jury. Moreover, Government Instruction No. 3 closely tracks the provision in Modern Federal Jury Instructions:

> You may not draw any inference, favorable or unfavorable, towards the government or the defendants on trial, from the fact that certain persons were not named as defendants in the indictment or that certain persons were named as co-conspirators but not indicted. The circumstances that these persons were not indicted must play no part in your deliberations. Whether a person should be named as a co-conspirator or indicted as a defendant is a matter within the sole discretion of the United States Attorney and the grand jury. Therefore, you may not consider it in any way in reaching your verdict as to the defendants on trial.

Sand et al., *Modern Federal Jury Instructions-Criminal* § 3.01, Instr. 3-04.

Accordingly, I decline to strike the "Persons Not on Trial" charge and have incorporated it into my draft. *See* Draft Jury Instr. 14.

### D. Government Instruction No. 4

Defendant has clarified that she will not oppose Government Instruction No. 4 if I deny her *Daubert* motion. *See* Def.'s Jury Objection 2. Because I deny Ms. Ramsey's *Daubert* motion, I have included the Expert Witness instruction as proposed by the government in my draft jury charge. *See* Draft Jury Instr. 16–17.

### E.  Government Instruction No. 8

Ms. Ramsey objects to the final sentence of this proposed instruction, which reads "[t]he methods used to collect evidence or investigate should not enter your deliberations in any respect." Def.'s Jury Objection 2–3. Ms. Ramsey acknowledges that this instruction is standard but contends that it is only standard "with regard to the investigation and collection of evidence through [investigative devices] which jurors may have strong personal feelings about but are lawful investigative tools." *Id.* at 2. Defendant argues that she is entitled to present information concerning the circumstances of her confession and asks that I strike the entire charge. In the alternative, she asks that I strike the final sentence, which reads "[t]he methods used to collect evidence or investigate should not enter your deliberations in any respect." *See id.*

I agree that, in light of the fact Ms. Ramsey is entitled to attack the credibility of her confession, *see supra*, the jury is entitled to consider whether the circumstances of her confession made her confession less credible. I have typically instructed that "[w]hether you approve or disapprove of how the evidence was obtained should not enter into your deliberations. I instruct you that the government's use of the evidence is entirely lawful." *See United States v. Mohamed*, No. 18-cr-603 (ARR), ECF No. 259 ("Mohamed Instr."). Accordingly, I have replaced the government's proposed final sentence but incorporated Government Instruction No. 8 into my draft charge under the heading "How Evidence Was Obtained." Draft Jury Instr. 9.

### F.  Government Instruction No. 11

As an initial matter, defendant objects that the title of Government Instruction No. 11— "No Duty to Call Witnesses or Produce Evidence or Use Particular Investigative Techniques"—is misleading as applied to the government, because the government must put on a case. I agree and

have adjusted the title of the instruction to "Specific Investigative Techniques Not Required." Draft Jury Instr. 11.

Ms. Ramsey does not identify other purported flaws with Government Instruction No. 11, but requests that I issue a different instruction. *See* Def.'s Jury Objection 3. I do not see any substantive difference between defendant's proposed instruction and the government's, other than the fact that the government's proposed instruction refers to the indisputable proposition that "all persons who may have been present at any time or place mentioned in the case, or who may appear to have some knowledge of the issues in this case, need not be called as witnesses." Gov't Jury Instr. No. 11. I have adapted the government's charge into my draft under the headings "All Available Evidence Need Not Be Produced" and "Specific Investigative Techniques Not Required." Draft Jury Instr. 9, 11.

### G. Government Instruction No. 12

Defendant objects in various respects to the government's proposed charge on the definitions of "Knowingly, Willfully, [and] Intentionally."

#### 1.    *Government Instruction No. 12(A)(i)*

Ms. Ramsey contends that the government has not established the factual predicate for a conscious avoidance instruction and there is a risk of jury confusion resulting from an instruction on conscious avoidance. Ms. Ramsey acknowledges that "the government is not required to commit to a theory of actual knowledge or conscious avoidance," but that hers is a scenario in which "the only evidence alerting a defendant to the high probability of criminal activity is direct evidence of the illegality itself." Def.'s Jury Objection 4–5 (quoting *United States v. Nektalov*, 461 F.3d 309, 316 (2d Cir. 2006)).

28

"The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quotations omitted). The conscious avoidance theory allows a jury to find a defendant acted with knowledge even where there is no evidence that the defendant had actual knowledge. *Id.* at 477–78. In *Nektalov*, the Second Circuit explained that "a conscious avoidance instruction is not appropriate where the only evidence alerting a defendant to the high probability of criminal activity is direct evidence of the illegality itself," which it described as a scenario in which "the evidence is that the defendant had either actual knowledge or no knowledge at all of the facts in question." 461 F.3d at 316 (quoting *United States v. Sanchez-Robles*, 927 F.2d 1070, 1074 (9th Cir. 1991)). To describe such a scenario, the court in *Nektalov* turned to the Ninth Circuit's opinion in *Sanchez-Robles*. In that case, the defendant was accused of attempting to smuggle marijuana across the U.S.-Mexico border; a customs inspector referred to the smell of marijuana as "an eight-to-nine" on a scale of one to ten. *Id.* at 1072. The defendant argued that she did not know she was carrying marijuana in her van because she did not recognize the smell of marijuana, and the Ninth Circuit held that a conscious avoidance instruction was erroneous because "[i]f [the defendant] recognized the smell as that of marijuana, then she knew that there was marijuana in the van," *i.e.*, she had actual knowledge, but if she "did not . . . recognize the smell of marijuana, then she had no reason to be suspicious" and therefore the case would not fit the conscious avoidance fact pattern. *Id.* at 1075.

However, as the *Nektalov* opinion recognizes, in scenarios where there is more than the "direct evidence of the illegality itself," such as the smell of marijuana in *Sanchez-Robles*, if a jury could rationally find beyond a reasonable doubt that defendant "strongly suspected, but was not

completely certain" of a fact and "deliberately avoided asking any questions . . . that might have confirmed [her] suspicions," a conscious avoidance instruction is appropriate. 461 F.3d at 316, 317. The government has advised that it intends to offer evidence that Ms. Ramsey admitted to Agent Strasser that, although she gave CC-1 information about the layout of Metro Station and the location of the safe, she did not know that CC-1 would steal the money. *See* Gov't Jury Reply 3. I am persuaded that this is a sufficient factual predicate to allow the conscious avoidance instruction to stand at this stage in the proceedings. However, my denial of defendant's motion is without prejudice to renewal following the close of the government's case.

Ms. Ramsey also argues that the instruction on conscious avoidance should not be issued because conscious avoidance cannot be used to demonstrate the element of intent to join the conspiracy. *See United States v. Ferrarini*, 219 F.3d 145, 154–55 (2d Cir. 2000) (holding that "[c]onscious avoidance may not be used to support a finding as to the" element of "knowing participation or membership in the scheme charged" but can be used to demonstrate "knowledge of the conspiracy's unlawful goals" (citation omitted)). Ms. Ramsey contends that "[n]o jury can effectively navigate the mental gymnastics required to fairly apply a conscious avoidance charge only to the 'knowledge' and not the 'intent' element" of the conspiracy charge, in part "[b]ecause the alleged conspiracy is limited in scope to a single illegal act." Def.'s Jury Objection 5. Defendant's argument was rejected by the Second Circuit's discussion in *Ferrarini*, which considered the same issue. There, the court upheld a district court instruction on conspiracy which referred to the standard definition of "knowingly" in the instruction on intent to form the conspiracy and referenced conscious avoidance only with respect to the "knowledge of unlawful objectives" prong of the conspiracy charge. 219 F.3d at 155–56. I have added clarifying language to the government's proposed jury charge on knowledge to comport with the decision in *Ferrarini*,

and the government does not oppose such a clarification to ensure that the jury is not misled. *See* Gov't Jury Reply 4; Draft Jury Instr. 21.

      2.    *Government Instruction Nos. 12(B) and 12(C)*

Ms. Ramsey requests that I replace the government's proposed instructions defining the terms "willfully" and "intentionally" with their equivalents from Modern Federal Jury Instructions, on the ground that the government's instructions might be confusing to the jury. Def.'s Jury Objection 6. I agree that the government's proposed instructions are somewhat confusing, because to act "willfully" is defined as "act[ing] knowingly and purposefully, with intent to do something the law forbids" whereas to act "intentionally" is defined as "act[ing] deliberately and purposefully." Gov't Jury Instr. 12(B), 12(C). I agree that taken together these definitions are confusing because they ask the jury to parse between "knowing[]" and "deliberate[]" purposeful conduct. Accordingly, I have amended the instruction on the definition of "willfully" in line with my instructions from prior cases. *See United States v. Kamaldoss*, No. 19-cr-543 (ARR), Final Jury Instr. at 17 ("Kamaldoss Instr.")[6]; Draft Jury Instr. 21.

**H.  Government Instruction No. 13**

Ms. Ramsey requests that I issue Government Instruction No. 14 (defining the elements of Count Two, the substantive offense) before Government Instruction No. 13 (defining conspiracy). I agree and have done so in the draft jury instructions.

Ms. Ramsey generally objects that the instructions on each element "are lengthy, repetitive, and misleading." Def.'s Jury Objection 6. Because she objects to specific passages, I will address these in turn.

---

[6] The final jury instructions from this case have been appended to this opinion.

- Ms. Ramsey objects to third paragraph of the description of the "existence of a conspiracy" element, *see id.*, which refers to Congress's intent in passing the conspiracy statute. I agree that the reference to the fact that "criminal agreements[] pose a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture," Gov't Jury Instr. 17, is unnecessary. I have previously used an instruction reading that "Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy was not successful," Kamaldoss Instr. 18, and have included an instruction to that effect in my draft, Draft Jury Instr. 30.

- Ms. Ramsey contends that references to conspiracy as "unspoken" and "by its nature characterized by its secrecy" will "unfairly and inaccurately water down the government's burden of proof and should be reserved for argument." Def.'s Jury Objection 6. I disagree. These instructions are typical and confirm to the jury that it will not need to find direct proof of the charged conspiracy and instead may infer its existence from the parties' conduct. *See, e.g.*, Mohamed Instr. 22.

- Ms. Ramsey also asks that I strike the final sentence of page 18 of the government's proposed jury instructions, which reads that "[t]he government contends that these [previously referenced] acts, conversations, and statements show, beyond a reasonable doubt, the defendant's knowledge of the unlawful purpose of the conspiracy." Def.'s Jury Objection 6 (citing Gov't Jury Instr. at 18). I agree that this instruction is unnecessary.

- Ms. Ramsey asks that I strike the second paragraph on page 19 of the government's proposed instruction as duplicative of the government's proposed instruction on motive. *Id.* The challenged paragraph explains that "[p]roof of a financial interest in the outcome of a scheme is not essential for a finding of conspiracy; but if you find that the defendant

has such an interest, that's a factor you may properly consider in determining whether or not the defendant was a member of the charged conspiracy." Gov't Jury Instr. at 19. Having reviewed this sentence and the government's motive instruction, I conclude that they are not duplicative of one another and decline Ms. Ramsey's request.

Ms. Ramsey contends that the "Elements of Conspiracy" and "Overt Act" components of Government Instruction No. 13 are lengthy, confusing, and repetitive and asks that I instead provide the instructions for each of these elements from Modern Federal Jury Instructions. Having reviewed both, I do not agree that the jury will be confused but have modified the language in the conspiracy charge based on prior charges I have given on conspiracy counts. *See, e.g.*, Kamaldoss Instr. at 18–22.

### I. Government Instruction No. 15

Defendant argues that I should not include a reference to her being charged as a "principal" with respect to Count Two because "the government's theory is not that Ms. Ramsey was the principal in Count Two," only that she gave information to CC-1 to allow him to steal the remittance envelope from Metro Station. Def.'s Jury Objection 7. Ms. Ramsey is charged under both theories, *see* Superseding Indictment at 2, and accordingly I deny Ms. Ramsey's objection. I have revised the government's proposed instruction on aiding and abetting liability in line with prior instructions I have issued. *See* Mohamed Instr. 18–20.

### J. Government Instruction No. 16

Ms. Ramsey contends that this instruction is inappropriate because the government cannot sustain a *Pinkerton* theory of liability for Count Two. Def.'s Jury Objection 8. As I ruled *supra*, the government has laid a factual foundation for a *Pinkerton* theory of liability. I therefore decline to strike this instruction from the proposed jury charge without prejudice to renewal.

**K.  Ms. Ramsey's Requested Instructions**

Ms. Ramsey asks that I instruct the jury as the weight to be given to her admissions. *See* Def.'s Jury Objection 8–9. I have adopted defendant's language except to strike any reference to the voluntariness of the confession, which I have already ruled may not be re-litigated. Draft Jury Instr. 10.

Ms. Ramsey also requests that I separately instruct the jury it is impermissible to infer participation in a conspiracy from mere presence and from association. The instructions contained in the draft jury instructions concerning conspiracy and aiding and abetting liability are sufficient to convey to the jury that these considerations are impermissible, and I decline to include a separate general instruction on these items. *See* Draft Jury Instr. 26, 34.

IV.    Ms. Ramsey's *Daubert* Motion is Denied

Ms. Ramsey moves to exclude testimony from USPS OIG Communications Intercept Analyst Piotr Orlowski concerning cell site location information ("CSLI"). First, defendant argues that the government provided insufficient expert notice under Federal Rule of Criminal Procedure 16(a)(1)(G). Next, Ms. Ramsey contends that Mr. Orlowski is not qualified to testify because he lacks specialized knowledge that would help the jury to understand the evidence. Finally, she argues that Mr. Orlowski's testimony is not the product of reliable principles and methods. I will address each argument in turn.

A.  **Legal Standard**

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court charged district courts with conducting "a preliminary assessment of whether the reasoning or methodology underlying the [proffered expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. 579, 592–93 (1993). In *Kumho Tire Co. v. Carmichael*, the Court confirmed that judges should conduct this assessment for all expert testimony, not just expert testimony based on science. 526 U.S. 137, 147 (1999). Because "the admissibility of all expert testimony is governed by the principles of [Federal Rule of Evidence] 104(a) . . . the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702, advisory committee's note to 2000 amendment (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

Although Rule 702 and *Daubert* itself "set forth specific criteria for [my] consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (citation omitted). Though the test is flexible, "it is critical that an expert's analysis be reliable at every step" because "the *Daubert* 'requirement that the expert testify to scientific knowledge . . . means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.'" *Amorgianos*, 303 F.3d at 267 (emphasis omitted) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). "In deciding whether a step in an expert's analysis is unreliable, [I] should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* In particular, I must be mindful of circumstances in which "there

is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). I am to distinguish these circumstances from those where there is "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method," in light of "the liberal admissibility standards of the federal rules" and the fact that our adversary system will also serve as a check on "debatable[] expert testimony." *Amorgianos*, 303 F.3d at 267.

Federal Rule of Criminal Procedure 16(a)(1)(G)(i) requires the government to disclose to defendant any testimony it intends to use at trial under Federal Rule of Evidence 702. The disclosure must include "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief[;] . . . the bases and reasons for them; the witness's qualifications[;] . . . and a list of all other cases in which" the witness has testified as an expert in the past four years. Fed. R. Crim. P. 16(a)(1)(G)(iii). The government must make this disclosure at a time "sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." *Id.* 16(a)(1)(G)(ii). "If a party fails to comply with Rule 16, the district court has broad discretion in fashioning a remedy, which may include granting a continuance or ordering the exclusion of evidence." *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (quotations omitted).

B. **The Government Has Adequately Supplemented Its Notice and There Is No Prejudice to Defendant**

Defendant argues that the government notice "does not disclose the opinions or bases for those opinions that Mr. Orlowski is expected to testify to" and that the disclosure is "perfunctory." Def.'s Expert Mot. 10. Even if the government's original disclosure was deficient, I find that the disclosure as supplemented by the government satisfies Rule 16(a)(1)(G). In conjunction with its opposition to the   motion to preclude, the government provided updated expert materials

describing Mr. Orlowski's methodology and has described his anticipated testimony. Gov't Expert Opp'n 3–4 & Ex. A at 4–7. As for the opinions that Mr. Orlowski will testify to, the PowerPoint presentation contains his conclusions, which are visual estimations of where the cell phones associated with CC-1 and Ms. Ramsey were during times relevant to this case. *See* Gov't Expert Opp'n Ex. A.

I decline to foreclose the government from offering Mr. Orlowski's testimony on the basis of its putative failure to provide appropriate expert disclosures. The government served its original disclosures on February 28, 2023 and its supplemental disclosures one week later, on March 7, 2023. *See* ECF No. 45; ECF No. 48. Unlike the last-minute disclosures in *Ulbricht*, cited by defendant, there is no prejudice to Ms. Ramsey from the modification of the government's expert disclosures. *See* 858 F.3d at 115–16 (noting that the timing was plainly inadequate because the disclosures were made one day before the close of the government's case). Defense counsel's motion summarized in great detail the technology involved in CSLI, the typical methodologies used by CSLI experts in criminal cases, and potential flaws in CSLI analysis. Def.'s Expert Mot. 2–7. Ms. Ramsey can hardly say she is prejudiced by a supplemental disclosure on a topic that her counsel is well-prepared to deal with at trial.

## C. Orlowski Is Qualified

Ms. Ramsey also moves to preclude Mr. Orlowski's testimony because, in her view, Orlowski lacks "any scientific or other specialized knowledge that might qualify him as an expert." *Id.* at 10. For instance, Ms. Ramsey notes that he has not been qualified as an expert in years past and that he lacks "formal education in CSLI, data analysis, or mapping." *Id.* She characterizes his training as "one product-specific training in the past five years, of unknown duration and content." *Id.*

Defendant's position mischaracterizes Mr. Orlowski's qualifications. His CV suggests that he has two other product-specific trainings, in CellHawk and PenLink, both of which he undertook in 2017. *See* GR003066. The government represents that "[t]hese were full-time courses" attended for a total of three weeks. Gov't Expert Opp'n 2. Moreover, Rule 702 allows an expert to be "qualified" by his "experience." Orlowski has worked as a cell site location analyst for the United States Postal Inspection Service since August 2017, a role in which the government represents he "has handled an average of more than 40 investigations a year, and prepared mapping analysis in approximately 25 investigations annually." *Id.* Federal Rule 702 does not require that an expert attend a specific type or number of trainings for a specific length of time, and the Second Circuit has advised that "[t]he words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of [Rule 702]." *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). Finally, failure to have previously testified as an expert, without more, does not disqualify a proffered expert. What matters is that the expert have "knowledge, skill, experience, training, or education" in the field of his qualification. Fed. R. Evid. 702. Accordingly, I find that Mr. Orlowski is qualified.

### D.  Orlowski's Principles and Methods Are Reliable

Ms. Ramsey acknowledges that many courts have found CSLI expert testimony reliable. *See* Def.'s Expert Mot. 6 (arguing that "[c]ourts have usually allowed some expert testimony regarding historical cell site location information" but that certain courts have "imposed limitations" based on the limitations of the technology). "[H]istorical cellular location data have routinely been the subject of admissible expert testimony in this district." *United States v. Cantoni*, No. 18-CR-562 (ENV), 2019 WL 1441128, at *2 (E.D.N.Y. Apr. 1, 2019) (collecting cases). The government's description of Mr. Orlowski's methodology generally tracks defendant's description

of the typical methodology used by CLSI experts. *Compare* Gov't Expert Opp'n 3 (describing that the "process begins with the [call detail records]" containing location information, which are then uploaded into processing software to translate the data into a map generated based on user inputs) *with* Def.'s Expert Mot. 4–5 (stating that "an expert trained in cell site location analysis will use the call detail records . . . to create a map of towers and sectors used by a cell phone during voice calls or text messages" and noting that these maps will have some inherent imprecision). Having reviewed the government's submission, I do not see any flaws in Mr. Orlowski's methodology that would lead me to conclude that his testimony is not "the product of reliable principles and methods" and that those principles and methods have not been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. I therefore join the many other courts in this Circuit that have upheld expert testimony on CSLI. *See, e.g.*, *United States v. Dominque-McClain*, No. 21-CR-576 (KAM), 2022 WL 3682269, at *4 (E.D.N.Y. Aug. 25, 2022) (collecting cases); *United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 101911, at *6 (S.D.N.Y. Jan. 11, 2022) (same).

Ms. Ramsey also objects that Mr. Orlowski "rel[ies] on SyncArena, a software that defense counsel has never seen used by other [CSLI] experts." Def.'s Expert Mot. 11. In particular, Ms. Ramsey notes that the expert exhibits attached "include pin-pointed location markers," which are not possible to generate using reliable CSLI methods. *Id.* The government has since clarified that the pinpoints were intended to represent the location of cell towers, not the phones at issue, and has removed them from the exhibits. Gov't Expert Opp'n 5. I decline to find that the methodologies used are not reliable solely on the basis of his reliance on software that defense counsel is unfamiliar with.

E. **Conclusion**

For the foregoing reasons, defendant's motion to preclude Mr. Orlowski's anticipated expert testimony is denied. Ms. Ramsey's request for a *Daubert* hearing is also denied. *See United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (noting that the district court's gatekeeping function "does not necessarily require that a separate hearing be held" where "a sufficient basis for allowing the testimony is on the record").

## CONCLUSION

For the reasons set forth above, I:

- Grant in part and deny in part the government's motion *in limine*;
- Deny Ms. Ramsey's motion to bifurcate Counts One and Two from Count Three;
- Uphold in part and deny in part Ms. Ramsey's objections to the government's proposed jury instructions, and add my own modifications where necessary; and
- Deny Ms. Ramsey's motion to preclude the government's proffered expert testimony.

I also order the government to complete *Giglio* disclosures by no later than 12 p.m. on Thursday, March 16, 2023, order defendant to advise whether she intends to cross-examine Agent Strasser concerning the Geoff Symon materials by no later than 12 p.m. on Friday, March 17, 2023, and order both parties to provide supplemental objections to the jury instructions by no later than 12 p.m. on Monday, March 20, 2023.

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated:        March 15, 2023
              Brooklyn, New York